PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Compton, S.J.

COMMONWEALTH OF VIRGINIA

v. Record No. 021891

OPINION BY
JUSTICE DONALD W. LEMONS
April 17, 2003

LOUIS SCOTT HUDSON

FROM THE COURT OF APPEALS OF VIRGINIA

A jury found Louis Scott Hudson ("Hudson") guilty of the second-degree murder of his wife, Mary Donovan Hudson, known as "Mimi," and use of a firearm in the commission of the murder. In an unpublished opinion, the Court of Appeals reversed the judgment and dismissed the indictments. Hudson v. Commonwealth, No. 0917-01-4, 2002 Va. App. LEXIS 389 (Va. Ct. App. July 16, 2002). For the reasons stated, we will reverse the judgment of the Court of Appeals and reinstate the trial court's judgment.

I.  Facts and Proceedings Below

Hudson was indicted for first-degree murder of his wife and for using a firearm in the commission of murder. At trial, the court denied Hudson's motion to strike the evidence but permitted the case to proceed on charges of second-degree murder and use of a firearm in the commission of murder. The jury returned verdicts of guilty to both charges submitted. The trial court imposed the sentence set by the jury of seventeen years for murder and three years for use of a firearm and suspended five years of the sentence for murder.

Hudson and Mimi had been living together for about six to eight years prior to marrying in July 1999, three months before her death. There was no evidence of abuse between the two. In fact, evidence was presented that they had a good relationship.

Mimi had been declared incompetent in 1972 and was estimated to have the mental age of a twelve-year old. Mimi took prescription medicine and pain killers for chronic back pain, and at the time of her death, she had an infection in her right elbow. The infection in her elbow caused Mimi a "great deal of pain," and she was having "difficulty bending it and lifting, or holding anything." Just a few weeks prior to her death, Mimi had "overdosed" on Darvocet, a mild prescription pain-killer. Mimi's physician testified that she did not understand how to properly take the medicine, would not wait for it to work, and took excessive amounts. Evidence was presented that Darvocet can intensify the effects of alcohol.

Neither Mimi nor Hudson worked during the time they lived together. Mimi's allowance from her family trust fund supported the couple financially. Upon her death, none of the proceeds of the trust benefited Hudson.

Mimi loved horses and spent much of her time riding, and on the morning of September 20, 1999, she went on a fox hunt. After the hunt, she attended her father's memorial service. Her father had been sick for about 18 months, battling Parkinson's

disease and colon cancer and had died several days previously. Evidence was presented that Mimi was unhappy with the property distribution from her father's estate; however, there was evidence that Mimi was in good spirits after the fox hunt, had bought a new dress for the memorial service, and was excited about the family heirloom ring she had received from her father's estate.

During the luncheon following the memorial service, Mimi and Hudson consumed alcohol. When they returned home, they continued to drink. At the time of Mimi's death, her blood alcohol content was between .22 and .24, and Darvocet was present in her system.

David G. Donovan, the victim's twin brother, testified that Mimi did not like guns and did not like to handle them, but Hudson kept guns in the house. Evidence, however, was presented that on one occasion prior to the date of her death Mimi had fired a .22 revolver. Neighbors testified that on the night of September 20, between 5:00 p.m. and 6:00 p.m., they heard two or three high-powered rifle shots from the direction of Hudson's residence.

Wesley A. Thompson ("Thompson"), a friend of Mimi's, testified that about 7:45 p.m. on the night of September 20, Mimi called him to talk about her father's death. During the call, Hudson interrupted the conversation with obscenities and

asked Thompson why he was talking to Mimi.  Thompson then hung up the telephone.

Anne H. Hudson, Hudson's mother, testified that Hudson called her at approximately 7:30 p.m. and said that Mimi had shot and killed herself.  Obviously, the timing of the telephone calls is in dispute because Mimi could not have been dead at 7:30 and alive and speaking with Thompson on the telephone at 7:45.  Hudson's parents estimated that they arrived at Hudson and Mimi's house about five minutes after Hudson's call and saw Mimi's body, but that Hudson was not there.  Hudson's father then returned to his house and called the police at 7:52 p.m.

The police arrived at Hudson and Mimi's house at 7:57 p.m. They observed Mimi's body on the living room couch, with a .22 caliber revolver lying across her right palm in a manner described by an officer as looking "like it was backwards." There were bloody handprints on the back cushion of the couch, on Mimi's jeans, and on her forearm.  The officers did not see any blood on Mimi's hands.  Outside of the house, the garden hose was turned on "full blast" despite the fact that it was raining heavily that night.

Around 9:00 p.m. that night, Hudson's brother, Steven Hudson ("Steven"), saw Hudson sitting in his car in their parents' driveway.  Steven took Hudson inside to "sober up," while Hudson's father called the police.  Hudson's father saw no

4

blood on Hudson when he came in the house. At 9:17 p.m., the police arrived at Hudson's parents' house. When they entered the house, Hudson was sitting on the couch with a cup of coffee in his hand, and he appeared extremely intoxicated. Hudson's father told the police that he wanted Hudson out of his house. The police arrested Hudson for being drunk in public and took him into custody. At the time of his arrest, Hudson's blood alcohol content was .215. Although he did not tell the police when they arrived at his house, Hudson's father had removed a .270 caliber rifle from Hudson's car and taken it into the house prior to the arrival of police.

After being transported to the jail, Hudson was searched, and a .22 caliber bullet was found in his coat pocket. At 6:30 a.m. on September 21, Hudson was advised of his Miranda rights, and he gave a statement. According to Hudson, Mimi was unhappy after her father's memorial service because she felt that she deserved more money and property from her father's estate. He stated that while they were in the house, Mimi picked up the .22 caliber revolver that Hudson kept either on the couch or in a drawer adjacent to the couch, and started playing with it. Hudson told her, "[p]lease don't do that[,]" and said that "[e]verything will be okay." He said that while he was in the bathroom he heard a shot. He stated that when he returned, he saw Mimi slumping over on the couch. He said he never went near

5

the body.  He did not remember calling anyone after the shooting, including his mother, and he did not know why he did not call the 911 emergency number.  He said that he left his house after the shooting, but cannot account for his whereabouts or actions from the time of Mimi's shooting until 9:00 p.m., when he arrived at his parents' house.  Regarding the .22 caliber bullet found in his coat pocket, Hudson said he must have picked it up when he picked up loose change from his dresser.

On November 18, 1999, the Virginia State Police interviewed Hudson with his attorney present.  Hudson made reference to a trust established for Mimi's benefit.  He again stated that he and Mimi had been drinking at home after the memorial service and that Mimi was upset because her brother, as trustee of the trust, would not allow her to purchase a pick-up truck and a trailer.  He stated that Mimi then began playing with the .22 caliber revolver.  After Hudson went into the bathroom, Mimi announced that she was going to shoot herself.  Hudson replied not to worry about it, referring to the trust.  He then heard a shot, and when he came out he saw that Mimi had shot herself.  Hudson said he saw a little bit of blood around one of Mimi's eyes.  During the interview, Hudson said he never went near the body, but later he said he did not recall going near the body or touching it.  He denied handling any firearms that night; he

6

stated that his most recent handling of a firearm was two days prior to Mimi's death. Again, he could not account for his whereabouts between the time of the shooting and the time he arrived at his parents' house. Hudson did not remember any telephone calls being made or received that night, either by Mimi or him, including the telephone call to Thompson.

During trial, the medical examiner, Dr. Carolyn Revercomb ("Revercomb"), who conducted the autopsy on Mimi, testified that Mimi had a contact range wound to her head through her left ear. The bullet traveled from the left ear up towards the right and towards the back of her head. Revercomb testified that such a wound would cause immediate unconsciousness, and death would follow within minutes. She also testified that after the shot was fired, rapid and copious bleeding occurred and there would have been no voluntary movement by the victim.

Gary Arnsten ("Arnsten"), a forensic scientist with a specialty in firearms, testified that the bullet recovered from Mimi's brain was fired from the .22 caliber revolver found on her right palm. Arnsten also testified that it is necessary to manually cock the hammer of this revolver before firing it.

Additionally, a fingerprint expert, Richard Willett ("Willett") and a gunshot residue expert, Eugene R. Harrison ("Harrison") testified. Willett testified that no latent fingerprints were found on the revolver or any cartridges.

7

Harrison, however, testified that both Hudson and Mimi had primer residue on their hands.  Only Mimi's right hand had primer residue on it, and the residue matched the .22 caliber cartridge identified as having contained the fatal bullet. Harrison identified primer residue on both of Hudson's hands, containing three elements, lead, barium, and antimony.  The residue found on Mimi's right hand contained only two elements, lead and barium.  In light of these findings, Harrison testified that it would be "unlikely" but not "inconceivable" that the residue on Hudson's hands came from the revolver that caused Mimi's death.

Marjorie Harris ("Harris"), an expert in blood stains, testified regarding the blood stains found on the couch cushion, the front left thigh of Mimi's jeans, and Mimi's right forearm. Harris testified that the blood contact transfer stains came from heavily bloodied hands, but the stains did not come from Mimi's hands because she had no visible blood on her hands. Harris also testified about the large blood stain that was found on the couch underneath a telephone book.  She opined that

> [t]he blood would have had to be placed there
> first and then the telephone book on top of that.
> . . .  [T]he stain that is prevalent and shows on
> the telephone book is not consistent with the
> stain underneath it.  That cushion had to be open
> to receive the blood and then the telephone book
> at a later time covered that blood stain.

8

Carol Palmer ("Palmer"), an expert in forensic biology, testified concerning the DNA composition of the various blood stains. First, Palmer testified that a spot of blood found on Hudson's left shirt sleeve was consistent with Mimi's DNA profile, and inconsistent with Hudson's DNA profile. Palmer further testified that the probability of finding someone with the same DNA profile as Mimi would be approximately one in fifty-one million in the Caucasian population. Palmer also identified the stains on the couch, the back cushion of the couch, and Mimi's jeans as having the same DNA profile as Mimi's blood, but a different DNA profile than that of Hudson.

## II. Analysis

The burden of proof upon the state in a criminal case was given constitutional status in In re Winship, 397 U.S. 358, 364 (1970) wherein the Court stated "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Later, with an analysis of the history of the use of the "beyond a reasonable doubt" standard, the Court acknowledged that the standard "defies easy explication," but held the following:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court

> instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather "taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury."

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (internal citations omitted).

Generally, there are two types of evidence presented during a trial – direct evidence and circumstantial evidence. Direct evidence is offered to prove as a fact the point in issue. Circumstantial evidence, by contrast, is offered to prove a fact not directly in issue, from which a fact in issue may reasonably be inferred.

There is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence. The finder of fact is entitled to consider all of the evidence, without distinction, in reaching its determination. See Downden v. Commonwealth, 260 Va. 459, 468, 536 S.E.2d 437, 441 (2000).

An instruction given in the case before us included the following:

> When the Commonwealth relies upon circumstantial evidence, the circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the circumstances proved create a suspicion of guilt, however, strong, or even a probability of guilt.

> The evidence as a whole must exclude every reasonable theory of innocence.

While such an instruction properly paraphrases our case law, the instruction, properly understood, does not add to the burden of proof placed upon the Commonwealth in a criminal case. The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt. See Cox v. Commonwealth, 140 Va. 513, 517, 125 S.E. 139, 141 (1924).

In the case before us, the Court of Appeals held that "the Commonwealth's evidence fails to exclude all reasonable hypotheses of innocence." Noting that Hudson argued that Mimi may have been "shot by accident" or "intentionally by her own act[,]" the Court of Appeals held that, "[t]here is evidence to support this hypothesis [sic] of innocence." With respect to the question of who fired the weapon, the Court of Appeals held that "there is some evidence that Mrs. Hudson may have fatally fired the gun." The error of the Court of Appeals is manifest in these holdings.

The issue upon appellate review is not whether "there is some evidence to support" these hypotheses. The issue is whether a reasonable jury, upon consideration of all the evidence, could have rejected Hudson's theories in his defense and found him guilty of murder beyond a reasonable doubt. In

11

support of its holding, the Court of Appeals focused primarily upon the evidence supporting Hudson's theories, namely, that the ".22 revolver that fired the fatal shot was found in Mrs. Hudson's hand[,]" "the gunshot residue found on Mrs. Hudson's right hand was consistent with the .22 shells at the scene[,]" "the gunshot residue . . . found on Hudson's hands was not consistent with that ammunition[,]" "there were no identifiable fingerprints found on the .22 revolver or any of the cartridges attributable to Hudson[,]" and the unsupported statement that "[t]here is simply no evidence establishing Hudson ever touched the weapon that fired the fatal bullet."

We have held in many cases that, upon appellate review, the evidence and all reasonable inferences flowing therefrom must be viewed in the light most favorable to the prevailing party in the trial court. Derr v. Commonwealth, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991); Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Circumstantial evidence is not viewed in isolation. "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.' " Derr, 242 Va. at 425, 410 S.E.2d at 669 (citations omitted). It is the province of the jury to evaluate the credibility of witnesses. Bloom v. Commonwealth, 262 Va. 814, 821, 554 S.E.2d 84, 87

(2001); Phan v. Commonwealth, 258 Va. 506, 513, 521 S.E.2d 282, 286 (1999). It is "within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts." Inge, 217 Va. at 366, 228 S.E.2d at 567-68.

In the case before us, the analysis of the Court of Appeals viewed the evidence in the light most favorable to Hudson rather than to the Commonwealth as required. Additionally, the Court of Appeals emphasized Hudson's evidence rather than the totality of the evidence as required. Finally, the Court of Appeals' analysis did not give proper deference to the province of the jury to consider the testimony and the credibility of the witnesses to determine reasonable inferences from such evidence, and reject as unreasonable the hypotheses offered by Hudson.

Of course, upon appellate review, the issue of exclusion of reasonable theories of innocence is limited to those theories advanced by the accused at trial. Subject to the ends of justice exception, appellate courts will not entertain matters raised for the first time on appeal. Rule 5A:18; Rule 5:25. In the case before us, Hudson did not testify at trial; however, many of his pretrial statements were introduced through other witnesses. Hudson's theory of innocence was advanced in counsel's argument to the jury.

13

Hudson argued only that Mimi committed suicide. He did not advance a theory of accidental shooting by Mimi or by himself. He did not advance a theory that the fatal shot was fired by someone other than Mimi. In closing argument, counsel stated to the jury, "Tragically, tragically, suicide is the only reasonable explanation of what happened on September 20th, 1999." Emphasizing the circumstantial nature of the evidence and the presumption of innocence, Hudson maintained that Mimi shot herself. He argued that there was no motive for Hudson to kill her, that Mimi had recently taken an overdose of medication, that there was no evidence of a prior history of violence between Hudson and Mimi, that both he and Mimi were under the influence of intoxicants, that the time between the telephone call to Thompson and Hudson's telephone call to his parents was too short for a murder and a cover-up of the murder to take place, and that gunshot residue evidence was inconsistent with Hudson having fired the fatal shot.

The Commonwealth argued that the jury must consider all of the evidence, not just Hudson's narrow isolation of certain aspects of the evidence. The Commonwealth argued that Hudson committed an unpremeditated killing of Mimi with malice sufficient to support a conviction for second-degree murder and that his theory of suicide was not reasonable. The Commonwealth properly noted that proof of motive is not an element of the

14

offense, but nonetheless noted that the fatal shot was fired shortly after Hudson expressed his anger over a telephone call between Thompson and Mimi. Mimi had placed the call, but it was terminated when Hudson took the telephone, and directed obscenities at Thompson. Thompson hung up the telephone. Shortly thereafter, Mimi died from a gunshot wound to her brain through her left ear.

The Commonwealth argued that Hudson shot Mimi immediately after the telephone call was terminated. Further, the Commonwealth argued that the crime scene evidence was inconsistent with Hudson's proffered theory of suicide and inconsistent with his own statements. There was no blood on Mimi's hands. The revolver was on top of Mimi's right palm in a position that was "backwards" from the position in which the revolver would have been found had Mimi shot herself. Mimi had an infected right elbow that was painful when manipulated. To have fired a long-barreled .22 revolver with her right hand into her left ear would have been awkward at best, and was most unlikely given her physical impairment.

Three bloody palm prints were found at the crime scene – one on the back of the sofa upon which Mimi's body was located, one on the left pant leg on top of the pocket, and one on her forearm. Mimi had no blood on her hands. Hudson said that he did not touch Mimi after he found her on the sofa with a gunshot

15

wound to the head.  Under Hudson's theory, only two people were in the house when the fatal shot was fired, Hudson and Mimi. Hudson's parents came to the crime scene before the police, but they stated that neither of them touched Mimi and that they got no closer to the body than the coffee table in front of the sofa.  Mimi's right hand was found lying on open pages of a commercial telephone book.  Mimi's blood was pooled under the telephone book despite the fact that her right palm with the revolver in it was on top of the telephone book.  An expert witness opined that the blood pooled on the sofa and thereafter, the telephone book covered the blood.

Hudson stated that he found Mimi on the sofa. Subsequently, according to his parents, he called his parents to tell them that Mimi had shot herself.  Then he disappeared for over an hour.  Hudson cannot account for his whereabouts during this time.  When he was found by police at his parents' house over an hour later, he had no blood on his hands.  Curiously, when police had arrived at the crime scene, they had found a garden hose outside the house running "full blast" despite the fact that it was "pouring down rain."  Hudson recalled no telephone calls that had been made or received that night.  His parents and Thompson refuted this statement.  Hudson stated that he had not handled a firearm for two days.  Primer residue was found on Hudson's hands; however, in addition to lead and

barium, the residue included antimony. Neighbors had heard rifle shots coming from the direction of the Hudson home in the afternoon before Mimi's death. A .270 caliber rifle was taken by Hudson's father from the back seat of Hudson's car when he arrived at their home after Hudson's unexplained absence following the fatal shot. Forensic examination revealed a blood stain, identified as Mimi's blood, on Hudson's shirt.

The Commonwealth argued to the jury that Hudson lied. He said that he had not handled a firearm in two days, yet primer residue was on his hands. He said that he had not touched Mimi or the couch, yet there were three bloody palm prints at the scene. Hudson never argued that his parents or anyone else accounted for these prints. Mimi's hands were not bloody. When examined, Hudson's hands were not bloody, but the hose had been found running "full blast" and over an hour had elapsed from the time that the police arrived at the crime scene to the time that Hudson was found at his parents' house. The Commonwealth noted that the additional element of antimony found on Hudson's hands was explained by its theory of the case: that Hudson shot Mimi, tried to arrange the crime scene to look like a suicide, washed his own hands, disappeared for over an hour, and was found with a recently fired rifle that was handled by Hudson after Mimi's murder.

The jury was entitled to evaluate Hudson's theory of innocence upon consideration of all the evidence and the reasonable inferences that flow from that evidence. It is clear that the jury rejected Hudson's theory as unreasonable. The evidence from the crime scene and the ensuing investigation was inconsistent with Hudson's theory of innocence and with his own statements to police. The jury was entitled to conclude that Hudson was lying to police and to reject the explanation offered by Hudson and utilized in closing argument by Hudson's counsel.

## III.  Conclusion

For the reasons stated, we hold that the Court of Appeals erred in reversing the judgment of the trial court. We will reverse the judgment of the Court of Appeals and enter final judgment reinstating the judgment of the trial court.

Reversed and final judgment.

18