COURT OF APPEALS OF VIRGINIA

Present:    Judges Petty, Athey and Senior Judge Frank
Argued by videoconference


BRANDI STARR FLOYD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1075-20-3                JUDGE CLIFFORD L. ATHEY, JR.
                                                         AUGUST 17, 2021

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Leyburn Mosby, Jr., Judge[1]

Joseph A. Sanzone (Sanzone & Baker, L.L.P., on brief), for
appellant.

Sharon M. Carr, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Brandi Starr Floyd ("Floyd") appeals her convictions for seven counts of credit card fraud in violation of Code § 18.2-195, and four counts of embezzlement in violation of Code § 18.2-111. Floyd contends that the evidence was insufficient to support her convictions because the evidence failed to establish beyond a reasonable doubt that she wrongfully possessed the credit cards. With respect to the embezzlement charges, Floyd further contends that the evidence failed to exclude a rational hypothesis that the payments made to her were either legitimate wages or loans. For the following reasons, we find the evidence was sufficient and affirm Floyd's convictions.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Hon. R. Edwin Burnette, Jr. presided over the trial and signed the order of conviction. Judge Mosby signed the final sentencing order.

UNPUBLISHED

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." Pryor v. Commonwealth, 48 Va. App. 1, 4 (2006) (quoting Commonwealth v. Hudson, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" Cooper v. Commonwealth, 54 Va. App. 558, 562 (2009) (quoting Parks v. Commonwealth, 221 Va. 492, 498 (1980) (emphasis omitted)).

So viewed, the evidence established that Floyd was a caretaker for J.S. who suffered from hydrocephalous. This chronic condition left J.S. with certain physical incapacities as well as memory loss. Floyd had been hired by J.S. in 2015 to assist with housecleaning, grocery shopping, and other minor errands. J.S. testified that she usually paid Floyd by check and that her hourly wage varied between $10 to $12 per hour. While Floyd was not a live-in caretaker, she would come to J.S.'s home to assist her a couple times a week.

J.S. had two credit cards, a Bank of America VISA signature card and a Discover credit card. J.S. testified that she used the credit cards for groceries and sometimes books. Further testimony by J.S. established that she did not give anyone permission to use her two credit cards other than allowing Floyd to use them occasionally to go to the grocery store for her but "that was all." On those occasions, J.S. retrieved the credit card from her purse and gave it to Floyd. Although J.S. had a driver's license, she did not drive or own a car. When J.S. was asked if she gave Floyd permission to use the credit cards for other personal purchases, she testified that she did not.

Prior to Floyd being hired, the balances on J.S.'s credit cards were minimal. In 2014, the Discover card had a balance of $3,404.80. After June 2015, when Floyd was hired, the balance

drastically increased to $9,762.57 by the end of that year. A similar pattern was established in 2016 with purchases totaling $39,170.12 charged to the Discover card with this number exceeding $46,000 by the end of 2017. The charges reflected during those years were for various purchases relating to car repairs, parties, sporting goods, restaurants, jewelry, children's clothing, nail salons, shoes, "putt putt" golf, lingerie, pets, online tickets, alcohol, and tattoos.

In addition, the Bank of America credit card was not frequently used before October 2015. However, in December 2015, over $1,000 in charges were made using the card. The new charges on the Bank of America card included car repairs, orthodontist fees, and children's clothing. By January 2016, the Bank of America card had over $4,500 in additional charges. The statement reflected that these additional charges included purchases at a toy store, a children's clothing store, a sporting goods store, a shoe store, a nail salon, travel agent fees, Disney Resort fees, and fees from a local pawn shop. Eventually by December 2017, the balance on the Bank of America card exceeded $7,000. Although the billing statements for the Bank of America card reflected J.S.'s address in Lynchburg in late 2015, beginning in December 2016, the mailing address for the Bank of America card was changed to Floyd's address in Rustburg. Floyd testified that the address on the Bank of America card was changed because J.S. was very giving and allowed Floyd to keep and use that card.

At trial, J.S. was questioned regarding the nature of the transactions on both the Bank of America and Discover cards. She denied purchasing anything from Dick's Sporting Goods, Toys R Us, Glamour Nails, Sin on Skin tattoo parlor, and Crow's Haven. J.S. also denied authorizing automotive repair bills from High Tech Automotive and Kennon Auto Sales among other purchases. J.S. had no children, pets, or tattoos and was confined to a wheelchair. J.S. testified that she typically purchased her groceries from Kroger, but the credit card statements reflected multiple

purchases from Walmart with consistent amounts of cash back received in addition to the total for items purchased. Further, purchases were made at the Food Lion in Rustburg where Floyd lives.

Although J.S. paid Floyd by check for employment services, Floyd would write most of the checks J.S. would sign. Floyd testified that she worked between forty-five to fifty hours per week but that she would determine her own schedule. Each paycheck was written from either J.S.'s Colorado Credit Union or Wells Fargo checking account and identified as payroll checks in the memo line. Floyd was J.S.'s sole caretaker unless a close family friend came into town during which times Floyd would receive a break. The close family friend reviewed his own credit card statements to determine the dates he visited J.S. between January 2016 and July 2018. During each of the dates in which the family friend was caring for J.S., Floyd still received a paycheck even though she did not work. Additionally, nine instances of overlapping dates of pay were written from separate checking accounts to Floyd.

Adult Protective Services referred the case to Lynchburg Police Detective Dubie who then began investigating J.S.'s financial accounts for fraud. On February 4, 2019, Detective Dubie spoke with Floyd about J.S.'s finances. Floyd told the Detective that there was no fraud and that she had letters documenting how she paid back loans to J.S. At the second meeting between Dubie and Floyd, Floyd's attorney provided him with a handwritten note dated August 6, 2018, that appeared to have J.S.'s signature on it stating that Floyd had paid back all the loans by working without pay over the three years of employment. At trial, however, Floyd testified that she paid J.S. back mostly with cash. J.S. identified her signature on the note but did not recall writing the note. Other testimony stated that the body of the note was not in J.S.'s handwriting.

The trial court found Floyd guilty and sentenced her to a total of fifteen years' incarceration suspending twelve years and six-months leaving an active sentence of two years and six-months.

Further, the trial court ordered Floyd to pay $90,000 in restitution to J.S., and placed her on eighteen months of supervised probation upon release.  This appeal followed.

ANALYSIS

Floyd contends that the evidence was insufficient as a matter of law to find that she committed credit card fraud because the Commonwealth failed to show that she did not have permission to use the card which was not stolen or misused.  Further, Floyd contends that the additional checks written to her were either repaid, or were rightfully hers.

On review of a challenge to the sufficiency of the evidence, this Court "will affirm the judgment unless the judgment is plainly wrong or without evidence to support it."  Bolden v. Commonwealth, 275 Va. 144, 148 (2008) (citing Coles v. Commonwealth, 270 Va. 585, 587 (2005)).  In conducting a sufficiency analysis, the appellate court does not "substitute its own judgment for that of the trier of fact."  Parham v. Commonwealth, 64 Va. App. 560, 565 (2015) (quoting Jordan v. Commonwealth, 286 Va. 153, 156-57 (2013)).  "'Rather, the relevant question is,' upon review of the evidence in the light most favorable to the prosecution, 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Dietz v. Commonwealth, 294 Va. 123, 132 (2017) (quoting Bowman v. Commonwealth, 290 Va. 492, 496 (2015)).

A.  Credit Card Fraud

Floyd contends that the evidence was insufficient to sustain her convictions of credit card fraud in violation of Code § 18.2-195 because the Commonwealth failed to establish that J.S. did not give Floyd permission to use the credit cards.  Additionally, Floyd contends that J.S.'s failure to complain to a financial institution supports a reasonable hypothesis of innocence that J.S. gave permission to Floyd to make the purchases.

Code § 18.2-195(1)(a) provides, in pertinent part, that "[a] person is guilty of credit card fraud when, with intent to defraud any person, [she] . . . [u]ses for the purpose of obtaining money . . . a credit card or credit card number obtained or retained in violation of § 18.2-192." Code § 18.2-192 provides, in pertinent part, that "[a] person is guilty of credit card or credit card number theft when . . . [she] takes, obtains or withholds a credit card or credit card number from the person, possession, custody or control of another without the cardholder's consent." The focus of Code § 18.2-195(1) is an individual's "misuse of a credit card wrongfully in his or her possession." Saponaro v. Commonwealth, 51 Va. App. 149, 152 (2008); see also Kovalske v. Commonwealth, 56 Va. App. 224, 232 (2010).

Floyd relies on Saponaro, 51 Va. App. 149, to support her contention that because she had permission and possession to make purchases with the credit cards on J.S.'s behalf, any improper purchases cannot, as a matter of law, be in violation of Code § 18.2-192. In Saponaro, the defendant's employer provided a credit card with which to make purchases on the company's behalf. Id. at 150. The defendant then made additional purchases that were not to further the business purpose. Id. This Court reversed the credit card fraud conviction because Saponaro had consent "to hold the credit card during the entire period he was making his personal purchases on the card." Id. at 151.

We distinguished Saponaro in Kovalaske, 56 Va. App. at 232-33. There, the defendant made unauthorized purchases with a credit card when he did not have permission to possess the card. We affirmed the convictions in Kovalaske finding that he "did not misuse his employer's credit card while it was in his lawful possession; [the defendant] misused [the employer's] credit card while it was in his *wrongful possession*." Id. (emphasis in original).

We again addressed this issue in White v. Commonwealth, 68 Va. App. 241, 248 (2017). There, the defendant's duties included taking the victim shopping and using the victim's debit

card to make purchases.  Id. at 247.  The victim would sometimes drop the debit card or forget to place it back in her purse, and we found that it was a reasonable inference that White was required to put the card back in the purse.  Id.  There we held that the evidence was sufficient to show that when White used the debit card at ATMs, "her possession of the card was not authorized as part of her employment."  Id.

Similarly, here, Floyd's use of the credit cards for a myriad of purchases that do not include J.S.'s groceries or books shows that these purchases were made while the cards were, at the very least, in Floyd's wrongful possession.  J.S. testified that she keeps her credit cards in her purse.  J.S. further testified that at no time did she authorize anyone to make purchases related to automobile repair.  J.S. consistently denied ever giving Floyd permission to use the credit cards for her own personal purchases.

Based on the extensive use and variety of the purchases placed on the credit cards, the trial court could rationally infer that Floyd did not have consent or permission to use the cards for these personal items.  While Floyd did occasionally have permission to make purchases on the credit cards for J.S., Floyd violated the statute when she made purchases while the credit cards were in her wrongful possession, exceeding the scope of her authority.

Further evidence of Floyd's misuse and deceit was shown to the trial court when Floyd changed the address of the Bank of America credit card statements to her address in Rustburg instead of J.S.'s Lynchburg address.  While Floyd claims that it was due to J.S.'s generosity, the trial court was entitled to reject her explanation and conclude that Floyd changed the address to conceal her fraudulent charges and possession of the credit card.

We addressed a similar reasonable hypothesis of innocence in White.  There, the appellant claimed that the Commonwealth failed to prove that the victim did not consent to the possession and ATM withdrawals due to the victim's forgetfulness.  "The reasonable-hypothesis

principle 'merely echoes "the standard applicable to every criminal case,"'" namely that "the Commonwealth has the burden of proof beyond a reasonable doubt." Id. at 248 (first quoting Vasquez v. Commonwealth, 291 Va. 232, 250 (2016); then quoting Hudson, 265 Va. at 513). "[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." Id. (quoting Ragland v. Commonwealth, 67 Va. App. 519, 531 (2017)).

Here, Floyd claims that J.S.'s forgetfulness presents a reasonable hypothesis of innocence that J.S. had given Floyd permission to use the credit cards. The trial court, acting as fact finder, was entitled to accept the fact that J.S. did not consent to the myriad of purchases made with her credit cards to various stores that J.S. does not provide patronage. Testimony established that J.S. had made no purchases at Dick's Sporting Goods, had no tattoos, had not visited Disney resorts, and did not possess a vehicle. As such, a rational fact finder could find that the hypothesis furthered by Floyd was incredible.

### B. Embezzlement

Additionally, Floyd contends that the evidence was insufficient to support a conviction of embezzlement because she was entitled to the funds from the additional checks. In support, Floyd posits that any loans or extra funds had been repaid.

Code § 18.2-111 provides, in pertinent part, "[i]f any person wrongfully and fraudulently use, dispose of, conceal or embezzle any money . . . [or] check, . . . which [s]he shall have received for another or for h[er] employer . . . or by virtue of h[er] . . . employment, . . . [s]he shall be guilty of embezzlement . . . ."

Simply put, the Commonwealth must establish "that the accused wrongfully appropriated to his or her own use or benefit, with the intent to deprive the owner thereof, the property entrusted or delivered to the accused." Zoretic v. Commonwealth, 13 Va. App. 241, 243 (1991).

Here, viewed in a light most favorable to the Commonwealth, the evidence clearly shows that Floyd drafted checks from two different bank accounts for an overlapping period worked and presented them to J.S. to sign. J.S., whose disability renders her with permanent memory deficits, has no recollection of making loans to Floyd, or writing a note stating that Floyd had repaid any loans. Additionally, Floyd drafted payroll checks and presented them to J.S. for signature for dates that she did not work. In March of 2017, Floyd received eight checks from one of J.S.'s checking accounts and an additional six checks from the other account totaling $5,275. By comparison, in March 2016, Floyd received a total amount from a single checking account of $1,070.

Floyd relies on a purported handwritten note from J.S. stating that any "extra" payments she received were loans made to Floyd, and such loans had been repaid in full. However, conflicting evidence was entered at trial with respect to the note. J.S. testified that she had no recollection of making any loans to Floyd or writing a note stating that Floyd had repaid her.

"When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" Towler v. Commonwealth, 59 Va. App. 284, 291 (2011) (quoting Corvin v. Commonwealth, 13 Va. App. 296, 299 (1991)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." Speller v. Commonwealth, 69 Va. App. 378, 388 (2018).

Here, the trial court found that Floyd's testimony regarding the double payment as loans to be incredible. Viewing the evidence as a whole, the trial court's finding that Floyd deceived J.S. is clearly supported by the record. Floyd was paid twice for the same time periods or time periods that she did not work at all. Although Floyd claims that any extra payments were for work that she was not paid for or loans, the trial court could reject Floyd's contentions and find a

reasonable inference that any note releasing Floyd from loans was further deception of J.S. As such, the record establishes that the trial court was not plainly wrong or without evidence to support the convictions.

CONCLUSION

The evidence was sufficient to establish that Floyd made improper purchases while wrongfully in possession of J.S.'s credit cards. Additionally, sufficient evidence exists in the record to establish that the trial court was not plainly wrong when it found that Floyd was guilty of embezzlement. Accordingly, we affirm.

<u>Affirmed</u>.