COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, White and Frucci

ANTHONY QUENTIN JOHNSON

v.     Record No. 2248-23-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE KIMBERLEY SLAYTON WHITE
NOVEMBER 26, 2024

FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
J. Frederick Watson, Judge

(Craig P. Tiller, on briefs), for appellant. Appellant submitting on
briefs.

(Jason S. Miyares, Attorney General; Robert D. Bauer, Assistant
Attorney General, on brief), for appellee.


Campbell County Sheriff's Deputy Williams pursued a suspect who drove erratically in his

car to escape Williams before abandoning his car and disappearing. Williams searched the car and

found fentanyl in the driver's side handle, along with other evidence supporting his testimony that

the suspect he pursued was Anthony Quentin Johnson. Johnson was later apprehended and

questioned by Williams about the pursuit, producing several admissions. He was charged with

knowingly possessing a Schedule I or II controlled substance and eluding the police. The trial court

convicted him of both charges.

Johnson challenges the sufficiency of the evidence used to convict him.[1] He argues that the

Commonwealth did not show that he possessed the fentanyl or was the suspect in the pursuit and

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a);
Rule 5A:27(a).

failed to exclude his proffered theory that another person was the suspect. Finding the evidence sufficient to sustain the convictions, we disagree and affirm.

BACKGROUND

A little after 11:00 p.m. on September 28, 2023, Deputy Williams responded to a call made concerning a gray Acura that had been parked in the "very private gravel lot" of a duplex for 20 minutes. Williams arrived at the parking lot around 11:15 p.m. while it was dark outside and saw a car fitting the description parked there. Because the Acura was facing the road, Williams drove around it so as not to approach it "head on" with his active spotlights. Williams then pulled up "directly next to" the Acura, two or three feet from it. The deputy's spotlights illuminated the driver's seat, where the car's sole occupant sat and reacted to the brightness of the lights. During trial, Williams identified Johnson as the Acura's occupant.[2]

As soon as Williams parked, the driver fled the lot at a "very high rate of speed," even "fishtailing" as he drove off the gravel lot and onto the paved street. Williams pursued the Acura with headlights on but emergency lights and sirens off. The Acura was always within Williams's eyesight and went 70 mph on the 45-mph road, which had no other vehicles on it. At some point in the pursuit, Williams turned his sirens on, the Acura reached 85 mph, and the driver veered over double-yellow lines and "into the oncoming lane of travel." The Acura started to take a left turn before ultimately making a U-turn and parking on the side of the road near Treadway Circle, a trailer park. Williams continued to pursue the suspect in his patrol vehicle.

Williams was about 50 yards away from the now-parked Acura when he saw the suspect exit and begin running into Treadway Circle. Williams testified that he got "a clear view of [the

---

[2] Appellant's reply brief objects to the Commonwealth identifying "as fact" that Johnson was the Acura's occupant because Williams did not know Johnson's name "[a]t th[e] moment" he shone his lights on the driver within. But Williams got "a good look" at the driver, which allowed him to subsequently identify that the driver was Johnson. Since Williams was quite familiar with Johnson's appearance by the time of trial, this contention is without merit.

suspect's] face" and that the suspect was wearing a long-sleeve yellow shirt or sweatshirt and dark-colored pants. Williams pursued the suspect and tried to cut off his escape by driving to the furthest entrance of Treadway Circle but was unsuccessful.

Williams returned to the parked Acura and saw the suspect kneeling on the ground in front of it and facing Williams's direction. Williams testified that his patrol vehicle's lights were on, that he got yet "another look" at the suspect, and that he had no doubt that the suspect was the defendant, Johnson. The suspect fled again on foot into Treadway Circle, but this time Williams did not pursue him for long because he believed calling K-9 services to the scene would be the "best course of action" to locate the suspect.

Williams returned to the Acura. Prior to searching it, he looked through the driver's side window from outside the vehicle and noticed a "red cut straw" with "a white residue" on the interior door handle. Williams determined that the straw was likely a device for "snorting" narcotics and searched the vehicle. A forensic analysis confirmed that the straw contained fentanyl, a Schedule II controlled substance.

During his search, a gray and white phone plugged into the car radio was illuminated as it rang "non-stop" through the car speakers. Williams recognized the black male figure on the phone's wallpaper screen as Johnson.

Other items that Williams found in the search were a certificate of title for the Acura signed six days prior listing Johnson as the owner, a debit card listing Johnson as the holder, and a served arrest warrant listing Johnson as the defendant.

The last relevant item recovered in the search was a dash camera with an interior view that was operative. Williams obtained a search warrant to look inside the device and found photos from the same day of the pursuit. One photo was a still shot taken at 4:10 a.m. showing a black male whom Williams identified as Johnson. Another still shot was taken at 3:01 p.m. with the same male

and a yellow sweatshirt lying in the back seat, which Williams identified as being the same yellow sweatshirt worn by the suspect during the pursuit incident. There were no photos or recordings taken during the actual pursuit.

Johnson was not found on the day of the incident but was arrested and interviewed by Williams in jail at a "later date." The interview was recorded, and proper *Miranda*[3] warnings were given. Johnson denied that he was in the car during the incident but admitted that he owned it and had been driving it earlier on the day of the incident. He did not deny that everything found in the vehicle was his. He also admitted that he used fentanyl the day of the incident, that he "used [the cut straw] to sniff Fentanyl," and that the straw "could have possibly been" his. He acknowledged that using fentanyl violated the terms of his probation.

Johnson testified at trial that he does not know "for sure" whether the straw belonged to him because of the alleged involvement of a third party whom Johnson claims to have been the suspect in the incident. Johnson stated that around 8:30 p.m. or 9:00 p.m. he went to the Knights Inn hotel in Amherst County, Virginia, and fell asleep in a hotel room while a man named Josh Tanner was present. Johnson asserted that Tanner then stole his car and engaged in the police chase with Deputy Williams. Johnson opined that Tanner "could have" been the one who possessed the cut straw. Johnson also noted that Williams wrote in his report that the suspect appeared to be approximately six feet tall, whereas Johnson is five feet eight inches. But Johnson never reported the car stolen and did not mention Tanner's name during his interview with Williams or at any other time before trial.[4]

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] During the jail interview with Williams, Johnson did not mention Tanner's name. He did state, however, that he was in Madison Heights on the night of the incident using fentanyl but had "never explained this" before the interview because he feared he would be "kicked out [of] the [halfway house] program" for his drug use. He explained that he was in the hotel room "asleep[,] . . . with like two other girls and a dude . . . I didn't know the dude." He asserted that

- 4 -

At the bench trial, the trial court weighed the conflicting testimony of Johnson and Williams and found Williams's "unequivocal[]" testimony to be credible. Williams had "three different opportunities" to see the suspect and identified him as Johnson.[5] The trial court found that Williams's inaccurate description of the suspect's height did not undermine his credibility: "[A] difference of four inches . . . I don't find . . . to be a significant problem with [Williams's] testimony. . . . [F]our inches, from a distance, . . . [does not] affect[] his credibility." Johnson was found guilty of one count of possessing a Schedule I or II drug and one count of eluding police. He was sentenced to five years in prison, of which three were suspended.

On appeal, Johnson argues that the Commonwealth's evidence is not sufficient to prove that he possessed the drug residue found in the car since he alleges that he was not driving the car during the incident. He also contends that the Commonwealth's evidence is insufficient to convict him of eluding police because it fails to show that he was driving the fleeing car.

ANALYSIS

We review a challenge to the sufficiency of the evidence in the light most favorable to the Commonwealth, the party who prevailed at trial. *Hargrove v. Commonwealth*, 77 Va. App. 482, 506 (2023). The trial court's judgment should be affirmed unless "plainly wrong or without evidence to support it." *Id.* at 506-07 (quoting *Ele v. Commonwealth*, 70 Va. App. 543, 548 (2019)). Pieces of circumstantial evidence may sustain a conviction if their combined weight is

_____

the male whom he did not know got into Johnson's car that night and took it, though he did not explicitly say that the man stole the car. Johnson said: "I'm explaining to you that I was on Fentanyl asleep and my car was taken."

[5] These opportunities included: (i) when the suspect was sitting in the Acura in the parking lot; (ii) when the suspect parked on the side of the road and fled on foot into Treadway Circle; and (iii) when the suspect was kneeling in front of the Acura before fleeing once more into Treadway Circle on foot.

sufficient to prove guilt beyond a reasonable doubt, even if no single piece is sufficient alone. *Id.* at 507 (quoting *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc)).

The circumstantial evidence taken together, however, must exclude every reasonable theory of innocence and is not sufficient if it is "as consistent with a hypothesis of innocence" as with one of guilt. *Young v. Commonwealth*, 275 Va. 587, 592 (2008) (citing *Yarborough v. Commonwealth*, 247 Va. 215, 218 (1994)). The trial court weighs the evidence, determines any reasonable inferences that should be drawn from it, and decides "whether to reject as unreasonable" the theories of innocence put forward by the defendant. *Hargrove*, 77 Va. App. at 507 (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). Whether a theory of innocence is reasonable is a question of fact that is "binding on appeal unless plainly wrong." *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004) (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 13 (1997)). "As the Supreme Court has admonished and we here emphasize, it is the *fact finder*, not this Court, that determines whether a defendant's hypothesis is reasonable." *Fary v. Commonwealth*, 77 Va. App. 331, 347 (2023) (en banc) (citing *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). We review the trial court's conclusion by asking whether any reasonable factfinder "could have rejected" the defendant's theory of innocence and found him guilty beyond a reasonable doubt. *Emerson*, 43 Va. App. at 277 (quoting *Hudson*, 265 Va. at 513).

Johnson contends that the trial court erred in not striking the Commonwealth's case and in convicting Johnson of both charges. He views the evidence as insufficient to prove that he knowingly possessed the fentanyl or drove the Acura during the incident, arguing that the evidence fails to exclude his theory of innocence pointing to Tanner as the perpetrator.

The Commonwealth responds by asserting that the evidence presented is enough to support the trial court's determination on both charges. It contends that Williams's testimony, Johnson's

admissions, and the items found in the Acura, prove that Johnson possessed the fentanyl and drove the vehicle in the pursuit. We agree.

### A. Sufficiency of the Evidence Supporting the Possession Conviction

Johnson argues that the evidence does not "conclusively identify" him as the suspect driving the Acura or possessing the fentanyl found inside it. He also argues that Williams's identification of Johnson is not reliable or credible because the deputy had only "limited opportunity" to see the suspect as he sped away in the dark. Johnson finally argues that the Commonwealth's evidence is consistent with Johnson's claim that Tanner committed the crime and thus fails to exclude his theory of innocence.

Code § 18.2-250(A)(a) prohibits a person from knowingly or intentionally possessing a Schedule I or II controlled substance. Possession is a factual question that we review with due deference to the trial court's finding on the issue. *See Smallwood v. Commonwealth*, 278 Va. 625, 630 (2009). Possessing a drug may be proven by acts, statements, or conduct tending to show that the defendant was "aware of both the presence and the character" of contraband that was "subject to his dominion and control." *Hall v. Commonwealth*, 69 Va. App. 437, 448 (2018) (quoting *Logan v. Commonwealth*, 19 Va. App. 437, 444 (1994) (en banc)).

Owning or occupying a vehicle in which contraband is found may prove that a person knowingly possessed it if coupled with other probative circumstantial evidence. *See Burchette v. Commonwealth*, 15 Va. App. 432, 435 (1992); *Rawls v. Commonwealth*, 272 Va. 334, 350 (2006) ("[O]wnership or occupancy of the premises where [contraband] is found . . . may be considered as factors in determining whether [a person] possessed the [contraband]."). Additionally, proof that a person was near the contraband at a relevant time "may tend to show that, as an owner or occupant of . . . a vehicle, the person necessarily kn[ew] of the presence, nature and character of a substance that is found there." *Burchette*, 15 Va. App. at 435 (citing *Gillis v. Commonwealth*, 215 Va. 298,

301-02 (1974)). Lastly, we note that attempting to escape or flee from authorities may be "evidence tending to show guilt" that a factfinder may give such weight as he deems "proper in connection with other pertinent and material facts and circumstances in the case." *Turman v. Commonwealth*, 276 Va. 558, 565 (2008) (quoting *Jenkins v. Commonwealth*, 132 Va. 692, 694-95 (1922)). Based on the following, we find that the Commonwealth's evidence against Johnson is sufficient to convict him for knowingly possessing the fentanyl on the straw while he sped away in the Acura.

Johnson's testimony and the Acura's contents support the finding that he possessed the straw with fentanyl. He stated that he owns the Acura and that he was in it on the day of the pursuit. This admission is substantiated by the signed title certificate, debit card, arrest warrant, the two dash-camera still shots, and the phone found in the car. He stated that everything in the Acura "was [his]" and that the straw was "possibly" his too.[6] He admitted using fentanyl the day of the incident. Numerous pieces of circumstantial evidence support the conclusion that Johnson owned the straw and was occupying the vehicle that contained it on the night the straw was found.

Williams's testimony reinforces this conclusion by showing that Johnson was the suspect fleeing in the Acura. Williams saw the suspect three times and unequivocally identified him as Johnson at trial. Despite the darkness and the speed of pursuit, Williams's car lights illuminated the suspect on each occasion. On the first sighting, he was only two or three feet away from the suspect. He kept the Acura in continuous view while the suspect sped away in it. Williams testified that the suspect was wearing the same yellow sweatshirt or jacket as the one pictured in the dash-camera still shot taken eight hours before the pursuit showing Johnson alone inside the car.

---

[6] Johnson may have admitted to possessing the straw under direct examination: "Q: And then there was some straw with some residue found in the handle pocket. Are you admitting or denying—. A: I mean, that could possibly been [sic] there. I *used it* to sniff Fentanyl." (Emphasis added). His language indicates that he used the straw at issue to sniff fentanyl and that he is only uncertain as to whether it was in the Acura at the time of Williams's search.

Johnson's attempt to flee from Williams supports the finding that he possessed the fentanyl. A suspect's "attempts to escape or evade" may form a basis for arguing that he "d[id] so from consciousness of guilt," and this inference is stronger "[t]he nearer . . . [the flight is] to the commission of the crime committed." *Turman*, 276 Va. at 564-65 (quoting *Anderson v. Commonwealth*, 100 Va. 860, 863 (1902)). Here, Johnson attempted to flee from Williams as soon as Williams approached him in the duplex lot. His final flight on foot occurred moments before Williams discovered the straw. Johnson's numerous attempts to evade Williams and the short amount of time between his final escape and the discovery of the fentanyl indicate that Johnson was aware of his guilt and fled to avoid capture. They support the finding that he knowingly possessed the drug.

Finally, a reasonable factfinder could have rejected Johnson's theory of innocence as the trial court chose to do. The trial court heard Johnson's allegation that Tanner stole Johnson's Acura on the evening of the pursuit. But it found the countervailing evidence more persuasive, such as the fact that Johnson owned the car, was driving it that day, was seen by Williams while illuminated three different times during the pursuit, wore the same yellow sweatshirt visible in the dash-camera photo, left his cell phone in the Acura, admitted to using fentanyl that day and to having used the straw found within the car, and never mentioned Tanner until trial. Taken together, these pieces of circumstantial evidence are sufficient for a factfinder to conclude that Johnson, not Tanner, drove the Acura. The evidence is enough to support the conviction and foreclose Johnson's theory of innocence since a reasonable factfinder could well conclude that his alternative story was a fabrication. The trial court was not plainly wrong, and, therefore, we must affirm the conviction.

*B. Sufficiency of the Evidence Supporting the Eluding Conviction*

Johnson applies the same arguments for overturning his second conviction as those used to challenge his possession conviction. He argues that the evidence is insufficient to prove that he drove the Acura and thus cannot show that he violated Code § 46.2-817(B).

Code § 46.2-817(B) makes eluding police a felony if a person (1) receives a visible or audible signal from a law-enforcement officer to stop his motor vehicle and (2) willfully and wantonly disregards the signal "so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person."

Here, the Commonwealth proved both elements beyond a reasonable doubt after providing sufficient evidence to prove, as discussed above, that Johnson was the suspect who fled in the Acura. Johnson ignored the sirens during the pursuit and fled from Deputy Williams more than once. His conduct interfered with Williams's operation of his vehicle and endangered the deputy by causing a high-speed chase. Johnson's arguments do not justify overturning the trial court's determination of a question of fact—who drove the Acura during the chase. An abundance of evidence supports its determination that the fleeing suspect was Johnson.

CONCLUSION

For the foregoing reasons, we affirm Johnson's convictions for knowingly possessing a Schedule I or II controlled substance and eluding the police.

*Affirmed.*