UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, AtLee and Chaney
Argued at Norfolk, Virginia

MONTREAZ A. BERRY

MEMORANDUM OPINION[*] BY
v.        Record No. 0358-21-1             JUDGE VERNIDA R. CHANEY
MAY 31, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Christopher W. Hutton, Judge

Kelsey Bulger, Senior Assistant Public Defender (Virginia Indigent
Defense Commission, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial in the Circuit Court of the City of Hampton, Montreaz Berry

("Berry") was convicted of felony murder in violation of Code § 18.2-33 and was sentenced to

five years of incarceration.  On appeal, Berry contends that the evidence is insufficient to support

the felony murder conviction, and therefore, the trial court erred by denying his motions to strike

and to set aside the verdict.  For the following reasons, we affirm the conviction.

I.  BACKGROUND

In January 2016, Berry and Malira Craig lived together with their five-month-old son,

C.B.  Berry was unemployed and, beginning January 2016, became C.B.'s primary caretaker

while Craig worked.  On January 27, 2016, Craig arose early, fed C.B., and dressed for work.

When she left home at 6:30 a.m., Berry was bottle-feeding C.B. as they lay in bed together.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

C.B., whom Craig described as a "happy" child, was behaving normally and had no apparent injuries.

*C.B.'s Bruise, Bleeding, and Behavior*

At 1:08 p.m., Berry texted Craig that C.B. had bruised his lip and "it [was] really hurting him." Berry explained that the injury occurred when C.B. "bit down on [Berry's] chin." He stated that C.B. "flinch[ed] every couple of minutes" as he tried to sleep. Craig asked Berry to send her a picture of the injured lip. Berry replied that he would, but in the same text message he asked, "[W]hat are we going to do about choosing a daycare cause watching him everyday isn't helping me with getting back on my feet." Craig promised to call a daycare that day.

Berry sent Craig a picture of C.B.'s lip; but when he informed her that C.B.'s nose was bleeding and that he was concerned about C.B.'s "behavior," Craig left work and headed home. Before she arrived, Berry called her and told her that "something was wrong" with C.B.; however, he did not provide any details. Craig urged Berry to call 911, and she did the same. Emergency responders were at the home when Craig arrived. She accompanied C.B in the ambulance to Sentara CarePlex while Berry spoke with Officer R. Frescatore ("Frescatore").

*Berry's Statements*

Berry told Frescatore that C.B. had eaten and had been "a little bit irritable" and "a little bit gassy," but otherwise, had "seemed okay." He noted that he was changing his son's diaper when blood and "pinkish fluid bubbles" began draining from C.B.'s nose. Berry denied knowing how C.B. was injured and did not mention C.B.'s lip injury; however, he did tell Frescatore that C.B. had fallen next to the baby swing stand "the other day" and had "hit his head on the support."

Berry met with Sergeant J. Marmet ("Marmet") at Sentara CarePlex where C.B. was assessed by doctors. Marmet questioned Berry about the events leading up to his 911 call. Berry

described bottle-feeding C.B. and sleeping with him until 11:00 a.m. When C.B. awoke, Berry carried him into the living room, but C.B. was "kind of fussy." When he returned to the bedroom to change C.B.'s diaper, Berry noticed that C.B.'s nose was bleeding. Berry stated that he informed Craig about C.B.'s nose, but "after that," he called 911 because C.B.'s "eyes had rolled back in his head" and he appeared to be "passing out." Once again, Berry made no mention of C.B.'s lip injury.

Following C.B.'s assessment at Sentara CarePlex, he was transferred the same day to Children's Hospital of the King's Daughters ("CHKD"). Detective M. Shackelford ("Shackelford") interviewed Berry at CHKD on January 27, 2016. Berry told Shackelford that C.B. typically took another bottle at 9:30 a.m., but he slept through that feeding and refused a bottle at 11:00 a.m. When Shackelford asked Berry about any recent injuries to C.B., Berry mentioned the fall next to the swing, explaining that C.B. had "slipped out of the swing . . . and [had] hit his head on the floor . . . the Sunday prior." Berry stated that C.B. was initially "a little fussy" but "seemed fine after that." He also related that C.B. had bruised his lip, noting that C.B. had been "kind of thrashing his head around and hit his lip and also hit [Berry]'s cheek." Berry told Shackelford that after C.B.'s eyes rolled back in his head, he shook him; Shackelford recorded Berry as he demonstrated the shaking motion.[1]

The next day, January 28, 2016, the police obtained a search warrant and seized Craig's and Berry's cell phones. On the same day, Detectives Marmet and Mayer interviewed Berry at the police station. During this interview, they questioned Berry for details about C.B.'s lip injury. Initially, Berry stated that, while he and C.B. were in the living room, C.B. had lifted his head and dropped it against Berry's face, bruising C.B.'s lip. He iced C.B.'s lip and held him

---

[1] A video of this demonstration was played at trial; however, it was not admitted as an exhibit and therefore is not part of the record.

against his chest for about thirty minutes. When Berry took C.B. to the bedroom for a diaper change, he noticed that C.B.'s nose was bleeding. When he saw C.B.'s eyes roll back, Berry "shook him a little bit to try to get him awake and conscious."

When the officers questioned Berry further, he admitted that he had "reacted" when C.B.'s head struck him in the face. Berry stated that he was startled when C.B.'s face came down on the side of his face, so he held C.B. out and actually shook the child two or three times. Berry demonstrated how he shook C.B.[2] Describing his life as "difficult," Berry admitted that he had shaken the child in a moment of frustration and believed that his actions resulted in C.B.'s injuries. Berry signed a statement memorializing his interview with Marmet. Berry admitted in the written statement that he "lurched up . . . and . . . shook [C.B.] two or three times" after C.B. struck Berry's face with his head. Berry also admitted that he believed "his shaking . . . may have caused [C.B.'s] injuries."

### Commonwealth's Evidence

Dr. Flavia Walter, a child abuse pediatrician at CHKD, assessed C.B.'s injuries following his admission there. She stated that C.B. was intubated and on a breathing machine when she evaluated him. Dr. Walter observed a bruise on C.B.'s left eyelid, a bruise on his right upper lip, a cut inside his lip, and a bruise on his back. X-rays revealed two older, "healing" rib fractures on his left side. CT scans showed "subdural and subarachnoid hemorrhage bleeds" in the front and back of C.B.'s brain and in the "hemispheric area . . . between the halves of the brain." The scans also reflected cerebral edema. Dr. Walter noted bleeding in "multiple areas" of C.B.'s brain.

---

[2] A video of Berry's interview, including his demonstration, was played at trial; however, it was not admitted as an exhibit and therefore is not part of the record.

Dr. Walter spoke with Berry and Craig and asked them about any injuries to C.B. preceding his hospital admission. They told her about C.B.'s swing accident a "few days" earlier, explaining that "he had slid out of the chair, was standing holding on to it and then fell backwards onto his buttock and then over onto his right head." Berry also told Dr. Walter about the "headbutting" incident. Neither parent indicated that C.B. had a history of seizure, bleeding, or bone disorders. At trial, Craig testified that prior to January 27, 2016, C.B.'s only health problems were a skin rash and a "belly button" hernia; before his hospital admission, he had never experienced a seizure.

EEG tests conducted on January 27, 2016, revealed C.B. had "highly abnormal" brain activity. After he failed "brain death" tests on January 28, 2016, and January 29, 2016, C.B. was removed from life support. He died shortly thereafter.

At trial, Dr. Walter testified that neither of the incidents the parents described to her involved enough force to cause C.B.'s brain injuries. She opined that C.B.'s injuries were consistent with "abusive head trauma." Dr. Walter stressed that the effects of C.B.'s brain injury would have been apparent immediately, as quickly as "a minute," and could manifest as "fussy" behavior and depending on the severity, could lead to seizures and eventually death.

Dr. Walter based her abusive head trauma opinion on C.B.'s subdural, subarachnoid, retinal, and optic nerve bleeding, along with edema. She noted that the subdural hematomas and retinal hemorrhages were consistent with "abusive head trauma by the head going back and forth in a rotation." Dr. Walter explained that the forces associated with this motion caused the blood vessels around the brain to rupture and bleed. Initially, Dr. Walter's conclusion was based in part on the parents' failure to provide her with a plausible explanation consistent with C.B.'s injuries; however, "at some point" she learned that Berry had "confessed to shaking [C.B.]." Dr. Walter testified that, before she received that information, she had already concluded that

C.B.'s injuries resulted from abusive trauma, but Berry's confession was consistent with his injuries. She noted further that neck injury did not always accompany abusive head trauma, and therefore, the lack of any neck injury did not alter her opinion. Dr. Walter reviewed C.B.'s pediatric records before testifying, but she stressed that even assuming he had a pre-existing "blood disorder," it would not explain C.B.'s retinal hemorrhages, fractured ribs, or cerebral edema.

On February 1, 2016, Dr. Elizabeth Kinnison performed an autopsy on C.B.'s body and documented his injuries.[3] Like Dr. Walter, she opined that trauma caused C.B.'s death. Dr. Kinnison found bruises on the baby's upper lip, as well as two "fairly fresh" bruises on his left middle and lower back. A red area was visible around one eyelid. C.B. had two "much older" rib fractures that had occurred at different times. Dr. Kinnison's internal examination revealed bruises under his scalp, as well as subdural and subarachnoid hemorrhaging on the brain, and retinal hemorrhaging inside the eye and on the retinal sheath. A consulting neuropathologist's studies of C.B.'s brain and spinal cord tissue revealed that the subarachnoid hemorrhages had occurred close to the time of death, but some of the subdural hematomas were "very old" and had formed a "scar like" membrane. Dr. Kinnison found no signs of neck injuries.

Dr. Kinnison determined that C.B.'s death resulted from "blunt force injuries" to the brain and observed further that "acute hemorrhaging" was "related to why he died." In Dr. Kinnison's opinion, bruises beneath the scalp "typically" were associated with abuse, absent an alternative explanation. She agreed that such trauma could occur when a young child was shaken, causing the brain to strike the inside of the skull. Dr. Kinnison testified that head

_____

[3] Dr. Kinnison acknowledged that Dr. Walter and a "detective" were present when she performed the autopsy; however, she had "no specific recollection" of any information that they provided to her.

injuries could cause fatal seizures, and while she could not ascertain from her examination whether C.B. had a pre-existing seizure disorder, she observed nothing indicating he had "an illness or condition which would have aggravated or contributed to his death."

*Defense Evidence*

At trial, Berry testified in his own behalf. Despite his recorded and written statements to the police, he denied shaking or injuring C.B. Berry admitted that he was frustrated on January 27, 2016, but he denied that it was "serious" frustration.

Dr. Joseph Scheller, a pediatric neurologist, testified as an expert on Berry's behalf. Dr. Scheller admitted that he practiced medicine part-time and that the majority of his work was devoted to consulting and testifying as an expert witness. Although Dr. Scheller agreed that C.B.'s CT scans revealed bleeding on his brain, he did not believe it resulted from abuse or head trauma. Dr. Scheller stressed that C.B. had neither a skull fracture nor signs of trauma on his scalp such as a "goose egg" or swelling. Based on C.B.'s medical history before January 27, 2016, Dr. Scheller opined that C.B. suffered from chronic subdural hematomas due to a "rare" disorder involving fluid collection between his skull and brain. Dr. Scheller stressed that C.B.'s medical history revealed a "very unusual" rapid increase in his head circumference between his birth on August 11, 2015, and a check-up in December 2015. He noted that C.B.'s head circumference was only in the thirteenth percentile at birth, but it was in the seventy-first percentile four months later. Dr. Scheller attributed the rapid increase in size to fluid gathering between C.B.'s skull and brain.

Dr. Scheller testified that, due to this fluid accumulation, even minor trauma or injury could cause C.B. to develop subdural hematomas. In Dr. Scheller's opinion, C.B. sustained "some kind of minor trigger" that caused bleeding on his brain, resulting in a "dramatic seizure" on January 27, 2016, that caused him to stop breathing and develop edema. He noted that the

injury could have caused an older brain injury to "bleed again" and the "first sign" of hemorrhaging would be irritability. Additionally, Dr. Scheller noted that seizures could develop immediately after the hemorrhaging, or over the course of twenty-four hours, but he agreed that, if C.B. was behaving normally on the morning of January 27, 2016, "the most likely" time that he experienced an injury causing "fresh" subarachnoid bleeding was on January 27, 2016.

Dr. Scheller disagreed with the "widely accepted notion in the child abuse world" that an adult could shake an infant with sufficient force to cause fatal brain injuries, claiming that "the science" did not support it. He stressed that the autopsy showed no evidence of a "whiplash injury" consistent with being shaken violently or acute rib fractures consistent with the forceful grabbing of C.B.'s torso. Further, he noted that a young infant's ribs were "hard to break." Dr. Scheller stated that C.B.'s healing rib fractures were not necessarily caused by abuse, indicating that they could have been caused by a fall or another child or dog "jumping" on him; however, he agreed that the fractures raised suspicion of abuse.

*Commonwealth's Rebuttal Evidence*

On rebuttal, Dr. Walter testified that she had reviewed C.B.'s pediatric records, and although his rapid skull growth warranted "concern," nothing in his records indicated he was symptomatic or lagging in his development. Further, she stressed that C.B.'s fall from the swing was unlikely to have caused an older subdural hematoma to bleed because the bleeding on C.B.'s brain was "extensive" rather than restricted to a point of impact. Dr. Walter also disagreed with Dr. Scheller's testimony that violent shaking could not cause fatal brain trauma in infants. She emphasized that several reputable pediatric associations agreed that "shaking alone or shaking with impact [to] the head" could cause fatal brain injury to an infant, manifesting as brain swelling and hemorrhaging in the brain and retina. Finally, Dr. Walter opined that an infant's

ribs are not likely to be fractured by a fall or collision with another child or a pet because his ribs are "more pliable" than an adult's ribs.

*Berry's Motions to Strike and Set Aside the Verdict*

After the Commonwealth's case-in-chief, Berry moved to strike the evidence, asserting that the video of his interview with the police and his statement "could [not] be adequately summarized" as an admission that he shook C.B. Berry emphasized that, while Dr. Scheller "could not say for certain" what caused C.B.'s brain injury, he opined that "the most likely scenario" was that C.B.'s death resulted from a "chronic condition," combined with "an extremely minor event," "not abusive trauma." Berry asserted that Dr. Scheller's opinion was more credible than that of the Commonwealth's experts because he specialized in pediatric neurology. He also emphasized that Dr. Scheller had reviewed C.B.'s pediatric records before forming an opinion, whereas Dr. Walter reviewed those records "days" before trial and did not have the opportunity to compare them to C.B.'s hospital records and reassess her conclusions. The trial court concluded that the conflict in the experts' opinions presented a jury question and denied the motion.

Following the jury's guilty verdict, Berry moved to set it aside, asserting that the evidence failed to exclude a rational hypothesis that C.B. did not die from abusive trauma because a rational fact-finder could not attach less weight to Dr. Scheller's opinion than that of the Commonwealth's experts. The trial court denied the motion, emphasizing that the evidence before the jury was not restricted to expert testimony. The trial court found that the evidence also included "testimony about what happened that afternoon after Miss Craig left, what Mr. Berry did, and what Mr. Berry ended up telling the police."

## II. ANALYSIS

### A. Standard of Review

"When presented with a sufficiency challenge in criminal cases, [this Court] review[s] the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (citing *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

In assessing a defendant's hypothesis of innocence, the appellate court must determine "not whether 'there is some evidence to support'" the defendant's hypothesis of innocence, but rather, "whether a reasonable [fact-finder] upon consideration of all the evidence, could have rejected [the appellant's] theories in his defense and found him guilty of [the charged crime] beyond a reasonable doubt." *Hudson*, 265 Va. at 513. "[T]he factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017).

"Determining the credibility of witnesses . . . is within the exclusive province of the [fact-finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). In a "battle of the experts," it is the role of the jury "to resolve the conflicts in the

expert testimony and to decide which expert or experts were worthy of belief." *Atkins v. Commonwealth*, 272 Va. 144, 154 (2006). It is also the province of the fact-finder to decide the weight to be given to the evidence. *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (citing *Miles v. Commonwealth*, 205 Va. 462, 467 (1964)).

### B. The Evidence is Sufficient to Prove Felony Murder

Code § 18.2-33 defines felony homicide as "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those specified in §§ 18.2-31 and 18.2-32." Felony child abuse resulting in a child's death constitutes felony homicide. *See, e.g.*, *Edwards v. Commonwealth*, 65 Va. App. 655, 667-68 (2015) (evidence that child died from "blunt force trauma" sufficient to create jury question on felony homicide). "[T]he plain language of the felony-homicide statute goes beyond the common-law understanding of felony murder by permitting murder convictions based on nonviolent predicate felonies." *Flanders v. Commonwealth*, 298 Va. 345, 355 (2020). Nevertheless, "for a killing during the prosecution of a felonious act to constitute felony murder, there must be some malice inherent in the underlying felony." *Id. at* 357. "[T]he malice intrinsic in the commission of one of the predicate felonies 'provides the malice prerequisite to a finding that the homicide was murder.'" *Montano v. Commonwealth*, 61 Va. App. 610, 614 (2013) (quoting *Heacock v. Commonwealth*, 228 Va. 397, 403 (1984)).

Berry asserts that the Commonwealth's evidence "failed to sufficiently prove a causal link between the alleged felonious act and [C.B.'s] death." Berry contends that Dr. Walter's opinion that C.B's brain injuries resulted from violent shaking was based on "incomplete and misleading" information that Berry had confessed to shaking C.B. with sufficient force to injure him. Berry also contends that "Dr. Walter never reviewed the records that included the information about [C.B.]'s head growth" and that Dr. Kinnison only "suspected" that she had

- 11 -

reviewed C.B.'s complete records without being able to recall precisely what she had reviewed. Berry notes that Dr. Kinnison is not a neurologist and could not rule out the possibility that C.B. suffered from a pre-existing seizure disorder. By contrast, Berry notes that Dr. Scheller, a pediatric neurologist, based his opinion regarding C.B.'s cause of death on his medical records before and after his hospitalization. Berry also emphasizes that Dr. Walter admitted that C.B.'s rapid head growth was "concerning" and warranted "follow-up" to determine its cause. Relying on Dr. Scheller's testimony that C.B. suffered from "chronic fluid" on the brain that rendered him vulnerable to subdural hematomas, Berry maintains that the evidence failed to exclude a reasonable hypothesis that C.B. "died from natural causes." Thus, Berry argues that the evidence failed to exclude a rational hypothesis that C.B. died from "a chronic fluid condition" rather than abuse.

Relying on *Brake v. Brake*, No. 1204-13-4, 2014 WL 1301689 (Va. Ct. App. Apr. 1, 2014) (McCullough, J., dissenting), Berry maintains that the issue is not whether the evidence presented a factual question involving conflicting medical opinions, but rather, whether the opinions rendered by the Commonwealth's experts were premised on erroneous factual assumptions, *i.e.*, that Berry had confessed to shaking C.B. and that C.B. had no pre-existing neurological problems. [4] Berry asserts that the fact-finder could not "arbitrarily disregard" Dr. Scheller's unimpeached opinion testimony because it was neither inherently incredible nor contradicted by the Commonwealth's experts. Berry contends that *Cavazos v. Smith*, 565 U.S. 1 (2011), cited by the Commonwealth, is distinguishable because it involved conflicting expert

---

[4] While this authority has no precedential value, "unpublished decisions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012) (citing Rule 5A:1(f)). Even if the majority opinion were binding, however, the facts are distinguishable because, as the majority opinion noted, the parties in *Brake* stipulated to the admissibility of the challenged expert opinion and thereby had "stipulated that there was a sufficient factual basis for that opinion." *Brake*, No. 1204-13-4, slip op. at 5 n.3.

opinions, whereas this case involves the Commonwealth's failure to exclude a rational hypothesis of innocence. We disagree.

First, assuming, without deciding that the opinions rendered by the Commonwealth's experts were based on erroneous or incomplete facts, the record reflects Berry never objected to their admission or moved to strike them. *Cf. Vasquez v. Mabini*, 269 Va. 155, 161-63 (2005) (admissibility of expert testimony challenged based on "lack of factual foundation"). "Expert testimony founded upon assumptions that have no basis in fact is not merely subject to refutation by cross-examination or by counter-experts; it is inadmissible." *Lawrence v. Commonwealth*, 279 Va. 490, 498 (2010) (quoting *Vasquez*, 269 Va. at 160); *see also Toraish v. Lee*, 293 Va. 262, 269 (2017). The trial court properly ruled that the fact-finder should resolve factual issues because it was in its province to assess the credibility of the expert witnesses and assign weight to their testimony. Here, the jury found that the Commonwealth's experts' testimony was more credible and returned a verdict in favor of the Commonwealth.

Further, we disagree with Berry's argument that a rational fact-finder could not reject Dr. Scheller's opinion that C.B. suffered from a pre-existing, chronic condition that caused his death. "We recognize that 'a factfinder cannot arbitrarily choose, as between two equally plausible interpretations, one that incriminates [appellant].'" *Edwards v. Commonwealth*, 68 Va. App. 284, 303 (2017) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). If the evidence of innocence or guilt is in equipoise "after the factfinder 'resolves all conflicts in the evidence,'" "reasonable doubt exists as a matter of law." *Id.* (quoting *Haskins*, 44 Va. App. at 9). "The issue is whether a reasonable jury, upon consideration of all the evidence, *could have* rejected [appellant's] theories in his defense and found him guilty of [felony] murder beyond a reasonable doubt." *Id.* (quoting *Hudson*, 265 Va. at 513).

Here, contrary to Berry's assertion, Dr. Walter expressly testified during her rebuttal testimony that she reviewed C.B.'s pediatric records before trial. She stated that she had considered C.B.'s medical history and still concluded that his fatal brain injuries were caused by trauma and were not a result of any pre-existing disorder based on a reasonable degree of medical certainty. Further, although Dr. Kinnison could not recall precisely what she reviewed before preparing her autopsy report,[5] she noted that she typically requested the pediatric records. Assuming *arguendo*, she did not review the records, still, a rational fact-finder could attach more weight to her opinion than to Dr. Scheller's because, unlike Dr. Scheller, she examined C.B.'s injuries and performed the autopsy. Additionally, Dr. Kinnison testified that she saw no evidence during the autopsy that C.B.'s brain injuries resulted from a pre-existing seizure disorder.

As the trial court emphasized when it denied Berry's motion to set aside the verdict, the jury was tasked not only with evaluating the credibility of the medical experts' opinions, but also Berry's testimony denying he had abused his son. The experts disagreed regarding whether abusive trauma or "a minor trigger" caused C.B.'s lethal brain hemorrhaging, but both experts agreed that the event precipitating C.B.'s catastrophic brain injury occurred on January 27, 2016, when Berry was his sole caretaker. The jury had the opportunity to consider the Commonwealth's medical experts, Dr. Walter and Dr. Kinnison, as well as the defense's expert, Dr. Scheller. Furthermore, the jury also had the opportunity to view Berry's recorded interviews with the police and his demonstrations of how he shook C.B. Initially, Berry did not disclose C.B.'s lip injury or the shaking incident, but eventually, he admitted to the police that he was "frustrated" by his situation as a stay-at-home parent and that he "reacted" to C.B. knocking into

---

[5] Neither party offered the autopsy report into evidence at trial and therefore it is not part of the record.

his face by "sitting up" and shaking him two or three times, injuring his son. In addition to Berry's conflicting accounts, the jury had the opportunity to observe his demeanor both in the police interview and at trial. Based on the evidence, a rational fact-finder could conclude Berry abused C.B. and that this abuse caused C.B.'s death.

### III. CONCLUSION

We conclude that a rational fact-finder could adopt the opinions of the Commonwealth's experts that C.B.'s lethal brain hemorrhages and seizure resulted from injuries on the morning of January 27, 2016, while he was in Berry's care. Based on the totality of the evidence, the jury could also reasonably find that Berry's abusive conduct caused the injuries, resulting in his son's death. Therefore, the trial court did not err by denying Berry's motions to strike and to set aside the verdict. Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*