COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Athey and Callins
Argued at Virginia Beach, Virginia

ROBERT WAYNE COMPTON, JR., S/K/A
 MICHAEL COMPTON

v.      Record No. 0040-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE DOMINIQUE A. CALLINS
JANUARY 10, 2023

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
John W. Brown, Judge

Michelle C.F. Derrico, Senior Assistant Public Defender (Virginia
Indigent Defense Commission, on briefs), for appellant.

Victoria Johnson, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Robert Wayne Compton, Jr. appeals his conviction for petit larceny, third offense, under

the now-repealed Code § 18.2-104.[1]  On appeal, Compton alleges three assignments of error.

First, he contends that the trial court erred in convicting and sentencing him under Code

§ 18.2-104 because that statute was repealed, making his offense no longer felonious at the time

of his conviction.  Second, Compton contends that the trial court returned inconsistent verdicts

by convicting him of petit larceny while finding that the evidence was insufficient to convict him

of possession of burglarious tools and destruction of property.  Finally, Compton contends that

the trial court erred in finding the evidence sufficient to convict him for petit larceny.  For the

following reasons, we affirm the judgment of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The General Assembly repealed Code § 18.2-104 on March 18, 2021, pursuant to
2021 Va. Acts, Spec. Sess. I ch. 192, cl. 1, and the repeal became effective July 1, 2021.

BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Baldwin v. Commonwealth*, 274 Va. 276, 278 (2007).

In July 2020, Eusman Ahmed was employed as the manager of Skymart, a convenience store in Chesapeake. When he opened the store at 6:00 a.m. on July 6, 2020, he noticed that prize money was missing from the store's "quarter game machine" and that there was a small hole on the right side of the machine that had not been there previously. Ahmed reviewed the store's security footage from the previous day and observed that Robert Compton and another man, later identified as David Frazier, had been playing the machine from 7:57 p.m. to 9:17 p.m. on July 5, 2020. Ahmed recognized Compton as a regular store customer who would sometimes play the quarter game machine, and also recognized Compton by his tattoos.

On July 7, 2020, the owner of the machine, Byron Garin, went to Skymart to inspect the machine after one of the store managers informed him that the machine had been broken into. Upon inspection, Garin noticed the hole on the right side of the machine that had not been there before. He also noticed that money was missing from the machine and that there was only around $10 worth of quarters in the machine. Garin reset the machine by filling it with more money, and a police officer arrived and took pictures of the machine.

On August 6, 2020, Officer Heather Stiffler of the Chesapeake Police Department arrived at Skymart in response to a call from Ahmed that one of the suspects from the incident—namely, Compton—was at the store. Officer Stiffler conducted a field interview with Compton, who provided his driver's license, birth date, and social security number.

On March 2, 2021, Compton was indicted for petit larceny, third offense, under Code §§ 18.2-96 and -104, misdemeanor destruction of property under Code § 18.2-137, and

possession of burglarious tools under Code § 18.2-94. Compton pleaded not guilty to the charges, and a bench trial was held in the Circuit Court of the City of Chesapeake on March 26, 2021. Evidence of Compton's prior larceny convictions was admitted into evidence, and both Ahmed and Garin testified.

Ahmed testified that he reviewed the security footage occurring from 7:57 p.m. to 9:17 p.m. on July 5, 2020, and identified Compton as one of the individuals in the footage. Ahmed also testified that he reviewed the security footage occurring up until the time the store closed at 10:00 p.m. the day of the incident and that no one else played the game during that time. However, on cross-examination, Ahmed stated that he wasn't sure whether there were any customers playing the game after 9:17 p.m.

Garin testified that, to play the quarter game machine, a player inserts a quarter in the slot at the top of the machine, which falls down into the "playing field." A motorized platform is then activated which pushes coins forward until prize money is pushed into the "winning pocket," a four-by-four-inch opening at the bottom of the machine where players can retrieve their winnings. The more that people insert quarters into the machine, the more "push" there is, creating a greater chance for players to win money. Garin testified that he would put into the machine "a bunch of loose quarters" and four $10 rolls of quarters—one wrapped in a $100 bill and another wrapped in a $50 bill—and would also "throw some loose $20s in there, a couple loose $10s and some $5s." Garin explained that he would wrap the quarter rolls in large denomination bills and place loose paper money in the machine to encourage people to play the game in hopes of winning larger prize money. Garin testified that the position of the hole on the right side of the machine would have made it possible for someone to push money from the playing field into the winning pocket. Garin further testified that he had stocked the machine about a week before the incident and that he had lost around $500 in quarters and different

- 3 -

denominations of paper currency. Garin also testified that the machine was equipped with an alarm that would sound if the machine was shaken and that no one reported that the alarm had been activated.

During trial, the Commonwealth entered over thirty video clips of the store's security footage from 7:57 p.m. to 9:17 p.m. on July 5, 2020. The security footage initially shows Compton playing the quarter game machine, with Frazier standing at the right side of the machine. Both men can be seen looking around the store. Frazier performs a twisting motion at the side of the machine. Compton then reaches into the winning pocket, puts something into his pocket, and resumes playing. Frazier looks around the store and makes more twisting motions at the side of the machine. A customer enters the store, and both men look up at the customer. Then Frazier returns his gaze down to the side of the machine and performs more motions at the side of the machine. Both Compton and Frazier reach down to grab something from the winning pocket, and they look around the store. In the video, a store employee can be seen doing janitorial work. Frazier then continues to make twisting motions at the side of the machine. He stops and looks up when a customer enters the store. Frazier looks up again as another customer walks by, and then he bends down and makes more motions at the side of the machine. Frazier stops his motions when a customer enters the store, and then he starts again. Frazier can be seen wiping sweat off his forehead with his shirt. Frazier then bends down and does more twisting motions at the side of the machine, and he looks up as the store employee walks by.

Compton and Frazier then switch positions, and both men continue to look around the store. Frazier wipes more sweat off his face. Frazier begins playing the game, and Compton starts to perform twisting motions at the right side of the machine in a manner similar to Frazier. Frazier picks up something from the winning pocket. Compton bends down and makes more twisting motions. Both Frazier and Compton reach into the winning pocket. Compton continues

to bend down and perform motions that appear as if he is inserting and twisting something. Frazier then reaches into the winning pocket, and Compton also reaches into it. Compton continues to make motions at the right side of the machine, and both men look up when a customer enters the store. Compton then continues his motions, and Frazier reaches into the winning pocket. Compton and Frazier switch positions again, with Compton playing the game and Frazier at the right side of the machine. Compton reaches into the winning pocket, and Frazier makes an inserting motion at the side of the machine. Frazier starts to bend down and then stops and nods at a customer leaving the store. Frazier then immediately bends down low and continues making motions at the side of the machine. Frazier stops and stands up when a customer enters the store, and then bends down to make more inserting and twisting motions. Compton reaches into the winning pocket. Frazier bends down and performs an inserting and twisting motion, and then stops when a customer walks by.

After the Commonwealth rested its case-in-chief, Compton moved to strike all the charges. The trial court granted Compton's motion to strike the possession of burglarious tools and destruction of property charges. In granting the motion with respect to these charges, the court reasoned that, although the hole on the right side of the machine was "clearly made" recently by a tool, the court could not determine whether the hole "was made one day and they came back later on, or if it was made by somebody else."

The trial court denied the motion to strike the petit larceny charge. In denying that motion, the court explained that in the security footage Compton and Frazier "look[ed] like antelopes who are ever on the lookout for the lion to come through the grass" and that "[e]very time [the] door opened, they're both looking. Every time somebody walked in [the] room, they're both looking. Whenever [the] cashier moved, they're both looking. It's highly unusual." The court observed that Compton "when he was playing the machine, had his arm, a lot of the

- 5 -

time, pressed up on the left-hand side so as to block Frazier" and that "Frazier [was] bending down on the right-hand side. There's no need to do that. A couple of times, he was very low to the ground" and that Compton was "constantly reaching down . . . taking things out of . . . that 4 by 4 retrieval hole, and he's putting things in his right front pocket. They switch positions back and forth." The court acknowledged that it did not know how much money had been taken from the machine before Compton and Frazier started their activities, but "doubt[ed] that for an hour and 15 minutes [Compton would] pump quarters on there with $10 of loose quarters on the ledge." The court reasoned that, the more money in the machine, the more "push" is created, which creates a greater chance to win money, and thus the court "d[id]n't believe that the defendant or any reasonable person would stand there for an hour and 15 minutes if there is only $10 in coins on that ledge, knowing how the machine operates."

Compton elected not to present evidence in his defense and renewed his motion to strike in closing. Compton argued that the security footage clearly showed him playing the game—putting quarters into the machine and collecting items from the winning pocket—and thus the trial court could not exclude the possibility that he was innocently playing the game and won money in the normal course of play. The trial court rejected this argument, concluding that "you can be playing the game and still be stealing . . . one is not exclusive of the other" and that "dropping one or two [quarters] in the top . . . that doesn't mean anything." The court noted "Frazier's role in this whole thing on the right-hand side and bending down" and that "it's clear from the way the machine operates that any items stuck in that hole, whether it's a piece of coat hanger with a hook on it, or anything could rake that shelf on the bottom." The court again noted that the "actions of Mr. Frazier and [Compton] in looking at everybody who comes in the door is highly unusual." The court acknowledged that it could not see from the videos whether Compton's pockets were bulging with items taken from the machine, but that "it's clear that

- 6 -

[Compton was] picking up items out of that prize area and putting them in his right, front pocket." The court found Compton guilty of petit larceny, third offense.

At Compton's sentencing hearing, the trial court imposed a five-year sentence with three years suspended, pursuant to Code § 18.2-104.[2] During allocution, Compton stated that he was confused as to how he could be guilty of petit larceny when the court could not find him guilty of possession of burglarious tools and destruction of property, to which the court responded: "I gave you a break on that . . . and left you with one charge." The final sentencing order was entered December 28, 2021. This appeal followed.

ANALYSIS

I

For his first assignment of error, Compton contends that the trial court erred in convicting and sentencing him under Code § 18.2-104 because that statute was repealed at the time of his conviction, making his petit larceny offense no longer a felony. Compton observes that Virginia is a common-law jurisdiction and that, under the common-law rule of abatement, the repeal of a criminal statute requires dismissal of a pending criminal proceeding brought under that statute, unless the repealing act contains a saving clause enabling the prosecution of offenses committed before the date of repeal to continue. Compton asserts that the General Assembly's repeal of Code § 18.2-104 contained no such saving clause, and thus the common-law rule of abatement should apply.

Compton is incorrect. Although the General Assembly did not insert a saving clause into its repeal of Code § 18.2-104, the repeal automatically contained a saving clause pursuant to the

_____

[2] Under Code § 18.2-104, "for a third, or any subsequent offense, [the defendant] shall be guilty of a Class 6 felony."

Virginia general saving statute, Code § 1-239.[3]  The Virginia general saving statute was originally enacted in Code 1849, Title 9, ch. 16, § 18 to eliminate the requirement for the General Assembly to manually insert a saving clause into every new act of legislation and thus avoid the unanticipated triggering of the common-law rule of abatement.  *See Ruplenas v. Commonwealth*, 221 Va. 972, 977 (1981) (explaining that the general saving statute was "intended to change the common-law rule of abatement"); *Holiday v. United States*, 683 A.2d 61, 66 (D.C. 1996) ("As a way of preventing abatements of criminal prosecutions and other liabilities when legislatures failed to provide special savings clauses in the repealing legislation, state legislatures . . . adopt[ed] general savings statutes applicable thereafter to all repeals, amendments, and reenactments of criminal and civil liabilities."); Comment, *Today's Law and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation*, 121 U. Pa. L. Rev. 120, 127 (1972) (explaining that general saving statutes "shift[ed] . . . the legislative presumption from one of abatement unless otherwise specified to one of non-abatement in the absence of contrary legislative direction").

---

[3] Code § 1-239 states:

> No new act of the General Assembly shall be construed to repeal a former law, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture, or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture, or punishment so incurred, or any right accrued, or claim arising before the new act of the General Assembly takes effect; except that the proceedings thereafter held shall conform, so far as practicable, to the laws in force at the time of such proceedings; and if any penalty, forfeiture, or punishment be mitigated by any provision of the new act of the General Assembly, such provision may, with the consent of the party affected, be applied to any judgment pronounced after the new act of the General Assembly takes effect.

Here, the General Assembly's repeal of Code § 18.2-104 was a new act of the General Assembly—2021 Va. Acts Spec. Sess. I ch. 192—that became effective July 1, 2021, and the repeal contained no language stating that it would apply retroactively to all prosecutions still pending under Code § 18.2-104. Thus, pursuant to Code § 1-239, the trial court did not err in convicting and sentencing Compton under Code § 18.2-104 for petit larceny, third offense, committed on July 5, 2020, and indicted on March 2, 2021. *See Gionis v. Commonwealth*, 76 Va. App. 1, 11 (2022) (holding that the General Assembly's repeal of Code § 18.2-104 is subject to the requirements of Code § 1-239 and cannot be applied retroactively to offenses committed and indicted before the repeal of Code § 18.2-104 went into effect).

II

For his second assignment of error, Compton contends that the trial court erred by returning inconsistent verdicts—specifically, by convicting him of petit larceny while also finding that the evidence was insufficient to convict him of possession of burglarious tools and destruction of property.

"[U]nder settled principles, a trial court may not render inconsistent verdicts in the guilt phase of a bench trial." *Commonwealth v. Greer*, 63 Va. App. 561, 570 (2014). "Verdicts or convictions are inconsistent when the essential elements in the count wherein the accused is acquitted are identical and necessary to proof of conviction on the guilt count." *Wandemberg v. Commonwealth*, 70 Va. App. 124, 139 (2019) (quoting *Akers v. Commonwealth*, 31 Va. App. 521, 528 n.3 (2000)). As an exception to this general rule, we also recognize that "an inconsistent verdict w[ill] be sustained 'where the trial judge on the record explains an apparent inconsistency in the verdicts, and where the explanation shows that the trial court's action was "proper" and that there was no "unfairness."'" *Cleveland v. Commonwealth*, 38 Va. App. 199, 204 (2002) (quoting *Akers*, 31 Va. App. at 532 n.5).

For the trial court to find Compton guilty of petit larceny, third offense, it had to find:

> (1) That Compton took U.S. currency valued at less than $1,000 belonging to Skymart and carried it away;
> (2) That the taking was against the will and without the consent of the owner;
> (3) That the taking was with the intent to steal;
> (4) That the property was of some value; and
> (5) That Compton had at least two prior larceny convictions.

*See* Code §§ 18.2-96, -104; *Foster v. Commonwealth*, 44 Va. App. 574, 577 (2004) ("[L]arceny is defined as 'the wrongful or fraudulent taking of personal goods of some intrinsic value, belonging to another, without his assent, and with the intention to deprive the owner thereof permanently.'" (quoting *Dunlavey v. Commonwealth*, 184 Va. 521, 524 (1945)); *see also* Model Jury Instrs.—Crim. No. 36.220. For the trial court to find Compton guilty of possession of burglarious tools, it had to find:

> (1) That Compton had in his possession any tools, implements, or outfit which might be used for the purposes of burglary, robbery, or larceny; and
> (2) That he intended to use these tools, implements, or outfit to commit burglary, robbery, or larceny.

*See* Code § 18.2-94; *Burnette v. Commonwealth*, 194 Va. 785, 792 (1953) (defining the crime of possession of burglarious tools as "consist[ing] of two essential elements: (1) possession of burglarious tools[;] and (2) an intent to commit burglary, robbery or larceny therewith"); *see also* Model Jury Instrs.—Crim. No. 12.400. For the trial court to find Compton guilty of misdemeanor destruction of property, it had to find:

> (1) That Compton intentionally damaged, destroyed, or defaced the Silver Strike Coin Machine belonging to Skymart; and
> (2) That the value of or damage to the Silver Strike Coin Machine was less than $1000.

*See* Code § 18.2-137(B); *Scott v. Commonwealth*, 58 Va. App. 35, 49 (2011) ("Code § 18.2-137(B) attaches criminal liability when a person performs a volitional act that damages the property of another *and* the person specifically intends to cause damage to the property by

that act."); *see also* Model Jury Instrs.—Crim. No. 17.100. None of the elements for possession of burglarious tools or destruction of property are identical and necessary to prove that Compton committed petit larceny. Therefore, the trial court did not render inconsistent verdicts.

Furthermore, even if we assumed that the trial court rendered inconsistent verdicts, the court did not commit reversible error because it gave a valid explanation on the record for its verdicts, showing that its actions were not the result of confusion and did not result in unfairness towards Compton. During Compton's motion to strike, the trial court explained that it was granting the motion as to the possession of burglarious tools and destruction of property charges because, although the hole on the right side of machine was "clearly made" recently by a tool, the court could not determine whether the hole "was made one day and they came back later on, or if it was made by somebody else." In overruling the motion to strike the petit larceny charge, the court explained that it was basing its decision on all of the actions Compton and Frazier took during the security footage and the reasonable inferences to be drawn from those actions. Additionally, during sentencing, the court indicated that its decision on the motion to strike was an act of lenity towards Compton, stating: "I gave you a break on [the possession of burglarious tools and destruction of property charges] . . . and left you with one charge." *See Cleveland*, 38 Va. App. at 204-05 (assuming that the trial court's verdicts were inconsistent but holding that the court did not err because "the trial judge gave a valid explanation on the record for the verdicts," and "the judge considered his ruling to be an act of lenity . . . clearly establish[ing] that the ruling was not a product of confusion").

III

For his final assignment of error, Compton contends that the trial court erred in denying his motion to strike and finding the evidence sufficient to establish him as the perpetrator and to establish that property was missing. Compton asserts that no evidence established how much

money was in the quarter game machine when he played and that the evidence did not foreclose the possibility that another person was the perpetrator. Compton maintains that there was no evidence to exclude the possibility that he won money innocently while playing the machine. He claims that no rational trier of fact could have viewed the store security footage and found the evidence sufficient to convict him.

"On appellate review of a criminal conviction for sufficiency of the evidence to support the conviction, the relevant question is . . . whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010). "When reviewing the sufficiency of the evidence to support a conviction, th[is] Court will affirm the judgment unless the judgment is plainly wrong or without evidence to support it." *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008). "Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below. We also accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." *Id.* (citations omitted). "We owe deference to the trial court's interpretation of all of the evidence, including video evidence that we are able to observe much as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). "[W]e, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Id.*

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983). "Whether a hypothesis of innocence is reasonable is a question of fact, and a finding by the trial court is binding on appeal

unless plainly wrong." *Glasco v. Commonwealth*, 26 Va. App. 763, 774 (1998) (citation omitted).

> In considering an appellant's alternate hypothesis of innocence in a circumstantial evidence case, we must determine "not whether there is some evidence to support" the appellant's hypothesis of innocence, but, rather, "whether a reasonable [fact finder], upon consideration of all the evidence, could have rejected [the appellant's] theories in his defense and found him guilty of [the charged crime] beyond a reasonable doubt."

*Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004) (alterations in original) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Id.* (quoting *Derr v. Commonwealth*, 242 Va. 413, 425 (1991)).

In this case, a rational factfinder could have viewed the Skymart security footage and found the evidence sufficient to convict Compton for petit larceny. The trial court observed how Compton and Frazier would constantly look up at people who entered the store or walked by the machine, and rationally concluded that Compton and Frazier "look[ed] like antelopes who are ever on the lookout for the lion to come through the grass" and that "[e]very time [the] door opened, they're both looking. Every time somebody walked in [the] room, they're both looking. Whenever [the] cashier moved, they're both looking. It's highly unusual." The court observed that Compton and Frazier would "switch positions back and forth" and that Compton "had his arm, a lot of the time, pressed up on the left-hand side so as to block Frazier," and rationally concluded that they were engaging in concert of action. The court observed Frazier's movements and how he would bend down—sometimes very low—at the right side of the machine where the hole was, and rationally concluded that "there's no need to do that" and that "it's clear from the way the machine operates that any items stuck in that hole, whether it's a

piece of coat hanger with a hook on it, or anything could rake that shelf on the bottom" to steal money from the machine. The court finally observed that Compton was "constantly reaching down . . . taking things out of . . . that 4 by 4 retrieval hole, and . . . putting things in his right front pocket," and rationally concluded that Compton was stealing money that was being pushed off of the machine by Frazier.

Compton asserts that the trial court could not have known how much money he took because the Commonwealth never established how much money was in the quarter game machine before he started playing. But the court reasonably rejected that hypothesis, concluding that it "doubt[ed] that for an hour and 15 minutes [Compton would] pump quarters on there with $10 of loose quarters on the ledge" and that it "d[id]n't believe that the defendant or any reasonable person would stand there for an hour and 15 minutes if there is only $10 in coins on that ledge, knowing how the machine operates." Compton also asserts it is possible he won money innocently from the machine in the normal course of play. But the court reasonably rejected that hypothesis as well, concluding that Compton's occasional inserting of quarters into the machine was a ruse, because "you can be playing the game and still be stealing . . . one is not exclusive of the other." Compton finally asserts it is possible that another customer or store employee took money from the machine during the time period after Compton stopped playing. But the court could have reasonably rejected this hypothesis as implausible in light of the strong circumstantial evidence against Compton in the security footage. And ultimately, by finding Compton guilty, the trial court "found by a process of elimination that the evidence d[id] not contain a reasonable theory of innocence." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (quoting *United States v. Kemble*, 197 F.2d 316, 320 (3d Cir. 1952)).

CONCLUSION

The trial court did not err in convicting and sentencing Compton under the now-repealed Code § 18.2-104, nor did the court render inconsistent verdicts. The evidence was also sufficient to support Compton's conviction for petit larceny, third offense. Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*