COURT OF APPEALS OF VIRGINIA

Present:  Judges Athey, Ortiz and Chaney
Argued at Norfolk, Virginia


ABDIEL QUINONES BERRIOS

                                              MEMORANDUM OPINION* BY
v.        Record No. 0915-23-1                JUDGE DANIEL E. ORTIZ
                                              AUGUST 13, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Tanya Bullock, Judge

    Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent
    Defense Commission, on briefs), for appellant.

    Robert D. Bauer, Assistant Attorney General (Jason S. Miyares,
    Attorney General, on brief), for appellee.


        Abdiel Quinones Berrios appeals his convictions, following a jury trial, for second-degree

murder and use of a firearm in the commission of a felony, in violation of Code §§ 18.2-32

and -53.1.[1]  On appeal, Quinones Berrios argues that the trial court violated his right to present a

complete defense when it excluded body-worn-camera footage containing hearsay statements.  He

further asserts that the trial court erred in denying his motion to strike the convictions because the

evidence was insufficient to prove that he was the person who committed the crimes.  Finding that

the exclusion of hearsay statements did not violate Quinones Berrios's due process rights and that

the jury's conclusion that Quinones Berrios was the perpetrator is not plainly wrong, we affirm the

convictions.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

        [1] At trial, the appellant stated that his last name was Quinones.  In the briefs, the appellant
refers to himself as Quinones but the Commonwealth refers to the appellant as Berrios.  To
reduce confusion, this opinion will refer to the appellant as Quinones Berrios.

BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

## I. Friends Meet for Late-Night Get-Together

Shortly after midnight on June 11, 2021, Evania Valle drove with her fiancé Emmanuel Rivera in their silver sedan to the Military Highway Walmart in Virginia Beach to meet Quinones Berrios, Daniel Vasquez, and Luis.[2] Rivera was wearing his black fanny pack around his waist. Quinones Berrios arrived in a black BMW with Luis, and Vasquez arrived in his Nissan Rogue soon after.

Quinones Berrios, Rivera, Vasquez, and Luis were friends and colleagues. According to Vasquez, Rivera was going to surrender to the police later that day to serve a seven-day jail sentence, and he wanted to see his friends before he was incarcerated.[3]

Walmart surveillance camera footage from that morning shows three men congregating around a silver car. Valle identified the vehicle as Rivera's and the three men as Rivera, Quinones Berrios, and Luis. Rivera wore light-colored jeans, a black t-shirt, and a black baseball hat; Quinones Berrios wore a black shirt with white on the sleeve; and Luis was the relatively

---

[2] Luis's surname was never disclosed at trial, and he was referred to as "Minol" by other witnesses.

[3] Vasquez, who testified to many of the night's events, admitted at trial that he had numerous felony convictions.

shorter man in a black shirt with white lettering on his chest. From the surveillance video, Vasquez identified as his own the SUV that arrived later and stopped just behind the men. Valle identified herself as the light-haired woman who exited the silver sedan and talked with Vasquez shortly after he arrived.

Before the group left Walmart, Rivera handed a backpack, which contained a tan .45-caliber firearm, to Quinones Berrios. Vasquez explained at trial that Rivera often gave Quinones Berrios the gun because Quinones Berrios had a driver's license and therefore would be less likely to be subject to a search of his car if he were pulled over.

After a few minutes, the men got into Vasquez's Nissan and drove off. Valle drove to a nearby Wendy's for something to eat. Vasquez then drove the men around while they all smoked marijuana. Rivera and Quinones Berrios may have used heroin during this time. Vasquez admitted at trial that both Rivera and Quinones Berrios sometimes sold drugs.

About thirty minutes later, Rivera called Valle and had her return and meet him at the Walmart. From the Walmart, Rivera and Valle drove together to a nearby 7-Eleven; Quinones Berrios and Luis drove in the black BMW together, and Vasquez drove separately in his car. At 7-Eleven, Rivera bought cigarettes, food, and gas for everyone in the group. The group planned to continue their revelry at Rivera and Valle's apartment, in the Linkhorn Bay Apartments complex on Fountain Lake Drive in Virginia Beach. While the caravan continued to Rivera and Valle's home, Vasquez drove to his home in Chesapeake.

## II. Rivera is Shot and Killed

When Rivera and Valle arrived at their apartment complex, they parked in their assigned parking spot; Quinones Berrios and Luis parked on the street behind the parking lot. As Valle was gathering her bag in the car, a person approached Rivera from behind while he was still in the driver's seat. The person said, "Because you f***ed with us" in Spanish, and simultaneously

shot Rivera. Valle could see only the shooter's chest from her vantage point. Valle testified that the shooter wore a black shirt and could not recall if it had any lettering or design. Valle noted that the assailant had a Puerto Rican accent. Valle attested that she knew the accent was Puerto Rican because she was Puerto Rican.

Rivera got out of the car, looked at the shooter, and said, "What happened?" Shocked, Valle remained in the car for several moments before running away. When Valle was two car lengths away, she looked back toward Rivera and the shooter. Valle noted that the shooter was tall and skinny and, in addition to a black shirt, wore a black baseball hat and a black neck gaiter that had some color in it. When the shooter pointed the gun at Valle, she continued to flee. As she ran, Valle heard another gunshot. Valle looked back at the scene a final time and observed the shooter searching the passenger side of the vehicle. As Valle raced around the apartment building, she saw an open window and asked the person inside for help. Her neighbor allowed her to climb through the window, and someone in the apartment called 911.

At the time, Mark Millirons lived in a first-floor apartment at Linkhorn Bay Apartments with views of the complex parking lot. Around 1:00 a.m., Millirons heard "a loud pop" outside his home. After hearing that sound, Millirons looked out his bedroom window and saw a car parked in the first parking spot with its lights on and doors open. Two men were outside the vehicle about ten feet away from each other. One of the men was holding a pistol. The armed man was tall and skinny and wore "[d]ark clothes—black with white lettering going down the sleeves." Millirons noted that from his vantage point he saw the assailant's left arm. The men appeared to be arguing but Millirons could not discern what they were saying.

Millirons watched as the unarmed man, with his hands in the air, backpedaled across the parking lot and toward a silver truck. The assailant followed and shot the unarmed man. The unarmed man leaned against a truck, "went down to his knees[,] and . . . started crawling away."

- 4 -

The shooter continued to approach his victim, stood over him, and shot him again. After the final gunshot, Millirons observed the shooter leave toward Old Virginia Beach Road. While talking to a 911 dispatcher, Millirons heard tires spin and saw a speeding car turn right on Old Virginia Beach Road.[4]

Lara Hamze also lived at the Linkhorn Bay Apartments in the summer of 2021. She woke to the sound of a gunshot sometime after 12:30 a.m. At first, she was unsure what woke her. When Hamze heard a second gunshot, she looked out her third-story bedroom window and saw two men in the middle of the apartment-complex parking lot. One of the men was armed with a pistol while the second man retreated. According to Hamze, the second man had nothing in his hands. The armed man looked to be between 5'8" and 5'10" tall and wore black sweatpants, a black long-sleeved shirt with a white stripe from the shoulder down the left sleeve, and a black baseball hat. The armed man pushed the unarmed man to the ground and shot him from three or four feet away. The shooter then ran across the parking lot toward Old Virginia Beach Road.

Hamze noted that a third person was by the driver's side of a silver sedan that the shooter and victim had moved away from. This third person was about six feet tall, light skinned, and wore a short black short-sleeved shirt, baseball cap, and jeans. Hamze could not remember how the third person left the scene. While the shooter fled, Hamze called 911.[5] In her 911 call, Hamze noted that the doors to the silver sedan had been open during the incident but that when the police arrived the doors were closed.

Nicholas Chick lived 300 feet from Fountain Lake Drive. From his condominium on Polo Court, Chick could see the Linkhorn Bay Apartments and the complex's parking lot.

---

[4] Millirons's 911 call was played for the jury.

[5] Hamze's 911 call was played for the jury.

Around midnight, Chick heard a noise that drew his attention. He opened his door and saw a man in the parking lot stumble toward a vehicle before collapsing. Chick noted that the man appeared to limp as if he had already been hurt. A second man wearing a long-sleeved sweatshirt approached the collapsed man and shot him at close range. The shooter then rummaged through a vehicle before he ran toward Old Virginia Beach Road. Chick called 911 and followed the shooter.[6]

From Old Virginia Beach Road the shooter traveled on foot east on North Birdneck Road toward the intersection of Waterfront Drive and Marabou Lane. As the shooter approached the intersection, several police cruisers surrounded him. Thereafter, Chick lost sight of the shooter.

In Chick's 911 call, he described the shooter as a black man. At trial, Chick asserted that was inaccurate and that he could not tell the shooter's race because it was dark. Chick also acknowledged that he is colorblind.

III. Officers Pursue and Detain the Suspected Shooter, and Investigate Rivera's Death

At about 1:00 a.m., dozens of officers were dispatched to a reported shooting at 511 Fountain Lake Drive in Virginia Beach. The suspect was reported to be wearing a black hoodie with white lettering and had last been seen on North Birdneck Road. While driving at the 500 block of North Birdneck Road, Officer Gavin Christiana noticed a slim, light-skinned male, about 5'10" to 6'0" tall, wearing black pants, a black hat, and a black long-sleeved shirt with a white stripe on the arm. After dispatch again described the suspect, Christiana executed a U-turn and caught up with the suspect. At 1:02 a.m., Christiana began chasing the man on foot.

As Officer A.C. Snyder appeared on scene, he heard Christiana report that he had initiated a foot pursuit of the suspect who was reported to be "6 feet [tall] wearing all black with

---

[6] Chick's 911 call was played for the jury.

a white stripe on the sweater." Snyder joined the pursuit on Marabou Lane but lost sight of the suspect when he jumped a fence.

Minutes later, Officer Thomas Blagman observed a person matching the suspect's description walking on Marabou Lane in the direction of Nighthawk Place. When Blagman approached the suspect, he fled along Nighthawk Place. Blagman lost sight of the suspect at about 1:04 a.m.

Stationed as part of a police perimeter on C Avenue, perpendicular to Nighthawk Place, Snyder observed "a person who had come from the fence line wearing all black running across C Avenue." As Snyder exited his vehicle, the suspect began to run. Snyder ordered the suspect to stop. The suspect "put his hands up but ran a little farther in the parking lot of 'Little Theater of Virginia Beach.'" The suspect laid down and followed Snyder's command to put his hands behind his back. Snyder maintained the suspect, later identified as Quinones Berrios, at gunpoint until other officers arrived. After Quinones Berrios's arrest, Christiana identified him as the person who had fled from him earlier on North Birdneck Road. Officers noted that it was raining that evening and that Quinones Berrios was soaking wet when he was taken into custody.

After his arrest, Quinones Berrios was placed in an interview room with a surveillance camera. The surveillance footage showed Quinones Berrios take off his shirt, wring it out, and rub his hands on his arms and legs. Detective Andre Jerry administered a gunshot primer residue kit on both of Quinones Berrios's hands and collected his clothing—a black hat, a black shirt with white lettering down the left sleeve, a black undershirt, black pants, and a black gaiter with an eagle and lettering on it—for testing.

Forensic scientist Mary Keenan analyzed the primer residue kit from Quinones Berrios's hands. Keenan determined that "[t]here was one particle consistent with prim[er] residue in the area marked left hand." She found no primer residue particles on the right-hand sample. Keenan

explained that the particle found was consistent with a firearm larger than a .22-caliber weapon. She noted that the presence of the particle indicated that "either someone fired a weapon, handled a weapon, was in proximity to the discharge of a weapon, or touched something with prim[er] residue on it." Keenan acknowledged that primer residue could be removed by sweat, water, blood, or wiping.

Rivera died from the gunshot wounds he suffered in the attack. At the scene, forensic investigators recovered a cartridge, two cartridge casings, and a projectile near Rivera's body. Blood stains were discovered across the parking lot, on the front of the truck next to Rivera's body, and between the vehicles where officers found Rivera. Police officers discovered more blood stains in the passenger's seat of Rivera's silver sedan. Rivera could not be eliminated as a contributor to the blood's DNA profile. In Rivera's vehicle officers also discovered several baggies containing cocaine and fentanyl.

While officers processed the crime scene, Luis appeared driving Quinones Berrios's black BMW. Inside the car, officers found a plastic bag containing a folded paper with white powder that tested negative for any controlled substances.

At 7:00 a.m., Jenna Rentz found a small bookbag on the ground behind her home at 539 Nighthawk Place in Virginia Beach. The bag contained a loaded tan handgun and some baggies. Rentz found two other items in her yard that were not hers—a cell phone and a fanny pack on top of a canopy that shaded her porch. The fanny pack on the canopy contained $3,465.10 of U.S. currency, Rivera's photo identification, a keychain, and other baggies.

Although Rentz's small backyard was fenced, she acknowledged that the gate was not locked and anyone could open it. Rentz noted that Nighthawk Place was a dead end and that past her home was a wooden fence. Rentz stated that the Little Theatre was about a two-minute drive from her home.

- 8 -

At trial, Vasquez identified the firearm recovered from Rentz's yard on Nighthawk Place as Rivera's firearm. Forensic scientists developed a DNA mixture on the trigger and grip of the handgun. They determined that Rivera and Quinones Berrios could not be eliminated as contributors to the DNA mixture profile. A third DNA contributor was identified on the handgun but scientists could not identify that person.

Firearm expert Chris Luckie determined that the cartridge casings found at the crime scene were fired from the recovered .45-caliber firearm. Luckie determined that the bullet recovered during Rivera's autopsy was a .45 caliber, but the bullet was too damaged to determine if it was fired from the recovered firearm.

Rivera suffered four gunshot wounds. One bullet entered the back of his neck and exited through his forehead, another entered his cheek and traveled to his collarbone, where the projectile was recovered. A third bullet entered his lower lip and exited through his jaw. Because of the stippling around this wound, the medical examiner opined that this shot likely occurred inches to a few feet away from Rivera. Rivera was also shot in the torso. Rivera had blunt force injuries to his right eyelid and left shoulder as well as bruises and abrasions on his right thigh, his knees, and his right foot. Rivera's toxicology report indicated that he had high levels of cocaine, its metabolite, and fentanyl in his system.

At trial, the Commonwealth played a conversation between Quinones Berrios and his ex-girlfriend, Sonia Morales, recorded while Quinones Berrios was incarcerated on June 19, 2021.[7] During this conversation, Quinones Berrios admitted that he was high on drugs on the night Rivera was killed and that he and Rivera were arguing.

---

[7] The conversation was in Spanish but the Commonwealth admitted an English transcript of the conversation for the jury.

IV. Trial Proceedings

During his arraignment colloquy, Quinones Berrios affirmed that he had given his trial attorney the names of witnesses that would testify on his behalf and that they were present for trial. Quinones Berrios's trial counsel clarified that none of the witnesses were present on the first day of the scheduled four-day trial. However, the witnesses would be present later in the week when the defense anticipated putting on its case.

After the Commonwealth rested its case in chief, Quinones Berrios alerted the court that one of his witnesses was not present. Quinones Berrios claimed that he had subpoenaed Officer McMahon but the subpoena was never served because McMahon had left the police force.[8] In support of his theory that Rivera was killed in a drug- or gang-related hit, Quinones Berrios proffered that his evidence would show that an individual arrived at the scene of the shooting before police officers, behaved strangely, and left. Given McMahon's absence, Quinones Berrios sought to admit a portion of McMahon's body camera footage in which McMahon stated to Officer Kelly that the individual had arrived before them.[9] The officers stated that an individual arrived at the scene in front of them and had failed to yield to the officers even though their emergency lights and sirens were activated.

Quinones Berrios conceded that McMahon's statements in the bodycam video were hearsay. Nevertheless, he argued that his due process right to present evidence in his defense "trumped" the rules of evidence in this case and the trial court should admit McMahon's body camera recording in lieu of McMahon's testimony about what he had witnessed. He argued that the footage was relevant, reliable—because it was supplied by the Commonwealth—and supported his theory that someone else murdered Rivera. He contended that the court should not

---

[8] McMahon's first name was never disclosed at trial.

[9] Kelly's first name was never disclosed at trial.

mechanically apply the hearsay rule to prevent the admission of this relevant evidence which, he asserted, was crucial to his defense.

The Commonwealth objected that McMahon's body-worn-camera footage was irrelevant. The Commonwealth noted that the individual was not dressed as the assailant had been, and there was no evidence the individual who appeared at the scene had a gun. Although the body camera recording of another officer on the scene, Sergeant Frank Filippone, showed the individual begin to lift his phone, and indicated that officers told the individual not to take photographs, there was no evidence that the individual ultimately photographed Rivera's body or the crime scene. The Commonwealth contended that even if the individual took a picture, there was no evidence that the individual was anything more than a curious bystander.

The trial court found that McMahon's body camera footage was inadmissible. The trial court reasoned that the statements in McMahon's body camera footage were hearsay that did not meet any exception. Further, the conversation between McMahon and Kelly was not the "only evidence that's out there of this other person." Instead, Filippone could testify to the presence of the third person, who also appeared in Filippone's body-worn-camera footage. The trial court noted, however, that Quinones Berrios was not precluded from asking for reconsideration of the issue.

In his defense, Quinones Berrios called Filippone as a witness. Filippone testified that he and his partner responded to a shooting on Fountain Lake Drive on June 11, 2021. After Filippone finished taping off part of the crime scene, he noticed that people were congregating in front of the apartments several yards in front of the body. One of the individuals "appeared to raise what [Filippone] assumed to be a phone." Believing the person was preparing to photograph the body, Filippone yelled, "Hey, don't take a picture. Have some common sense and decency." The individual then walked away.

Filippone attested that he activated his body camera that morning and that it was a fair and accurate depiction of what he saw at the crime scene. In the footage, Filippone identified the officer standing next to him, and shielding Rivera's body from view, as McMahon. Filippone identified the individual he admonished as the man in long pants and a button-down shirt. After Filippone admonished the individual not to photograph Rivera's body, he walked off screen toward another apartment building and a parking lot.

Filippone was then shown Kelly's body-worn-camera video. Kelly's body-worn camera depicted Kelly taping off the area several yards in front of Rivera's body. As Kelly discussed where he should tape the scene, an individual walked by him. Filippone identified the individual who walked past Kelly as the same individual that he had admonished moments earlier.

On cross-examination, Filippone admitted that he never talked to the individual he had admonished or determined whether that individual took a photograph. He further acknowledged that people routinely attempt to take pictures of crime scenes. Quinones Berrios then played several body-worn-camera clips depicting statements Valle gave to investigators at the crime scene.

Outside the presence of the jury, Quinones Berrios renewed his motion to admit McMahon's body worn footage into evidence. Quinones Berrios played the contested footage for the court and argued that unlike other hearsay declarants, McMahon had no interest to lie. Further, he asserted that McMahon's statements were reliable because they were recorded on an officer's body-worn-camera footage that the Commonwealth provided to him. He argued that because the body-worn-camera footage was relevant and reliable, the court should not mechanically apply the hearsay rule to prevent the admission of this evidence.

The Commonwealth objected on hearsay grounds. The Commonwealth argued that "the hearsay rules exist because they provide . . . procedural due process." Further, the

- 12 -

Commonwealth asserted that its own due process rights were in jeopardy because it could not flesh out the context in which McMahon made his statements. The trial court sustained the Commonwealth's hearsay objection and refused to admit McMahon's body camera video.

After argument from counsel, the jury convicted Quinones Berrios of the charges and the trial court sentenced him to 43 years of incarceration, with 10 years suspended. Quinones Berrios appeals.

ANALYSIS

I. Admissibility of McMahon's Body-Worn-Camera Footage

Quinones Berrios asserts that the trial court violated his due process rights by excluding a clip of McMahon's body-worn-camera footage, even though it was hearsay. Determining the "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

The hearsay rule excludes as inadmissible any out-of-court statement "offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:802, 2:801(c). Here,

Quinones Berrios sought to introduce statements made by McMahon and Kelly that the suspicious individual who later appeared to take a picture of Rivera's body had arrived before the police officers. Those statements were made outside of court and were offered by the defense to prove that the man arrived before police officers. And Quinones Berrios points to no exception which would permit these hearsay statements to be admitted. *See, e.g.*, Va. R. Evid. 2:803, 2:804. The trial court thus did not err in concluding, as an initial matter, that the statements were inadmissible hearsay.

But the Due Process Clause of the Fourteenth Amendment at times compels an exception to the rules of evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973). In *Chambers*, the state rule preventing impeachment of one's own witness prevented a defendant from challenging a witness's in-court repudiation of three prior confessions to the murder at issue. *Id.* at 296-98. At the same time, hearsay rules prevented the defendant from putting forward testimony that the witness had previously confessed to the murder. *Id.* at 298. Taken together, these errors "deprived Chambers of a fair trial." *Id.* at 303. As to hearsay in particular, the Court concluded that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice" and exclude evidence bearing "persuasive assurances of trustworthiness." *Id.* at 302. In particular, the exclusion of hearsay evidence that is "highly relevant to a critical issue" violates the Due Process Clause of the Fourteenth Amendment when "substantial reasons exist[] to assume [the evidence's] reliability." *Green v. Georgia*, 442 U.S. 95, 97 (1979).

Based on this body of law, this Court has concluded that "[c]ombined, the rights to compulsory process, confrontation and due process give the defendant a constitutional right to present relevant evidence." *Neeley v. Commonwealth*, 17 Va. App. 349, 356 (1993). But at the same time, defendants "must comply with established rules of procedure and evidence designed

- 14 -

to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (quoting *Chambers*, 410 U.S. at 302). "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case." *Grattan v. Commonwealth*, 278 Va. 602, 623 (2009) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988)). "[T]he mere invocation of [the due process right] cannot automatically and invariably outweigh countervailing public interests." *Id.* (quoting *Taylor*, 484 U.S. at 414).

Here, Quinones Berrios seeks to introduce statements from McMahon's body-worn-camera footage that the suspicious individual arrived before police, in support of his hypothesis of innocence—that someone else killed Rivera in a drug-related execution and the individual at the crime scene was confirming the hit. The evidence was at least relevant to Quinones Berrios's defense, establishing how the unknown man came to be at the site—he arrived quickly, before the police, suggesting some foreknowledge of Rivera's death. Further, the evidence—unprompted statements by police officers at the crime scene, though uttered about forty minutes after they witnessed the man arrive—may have been highly reliable. *See Chambers*, 410 U.S. at 302. But in the context of the evidence as a whole, the statements were not so crucial that due process compelled their admission. As the trial court pointed out, other video evidence showed the man at the scene, that he appeared to be taking a photograph, and that officers had told him to stop. He seemed to be texting, and then left the scene quickly, while police were still taping off the area. In addition, the court permitted Quinones Berrios to argue at closing that the man's behavior was suspicious and indicative of someone taking verification of a hit. His arguments on that point were brief—only one argument among many intended to raise a reasonable doubt in the minds of jurors. In the context of the whole case, McMahon's statements

on video were not so central to Quinones Berrios's defense that its exclusion fundamentally deprived him of a fair trial. *See id.* at 303. The trial court therefore did not abuse its discretion in excluding the video as inadmissible hearsay.

## II. Sufficiency of the Evidence

Quinones Berrios also argues that the trial court erred when it denied his motion to strike the charges. In challenging the trial court's denial of his motion to strike the second-degree murder and accompanying firearm charge, Quinones Berrios necessarily asserts that the jury should not have been allowed to even consider the charges because "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor*, 285 Va. at 223). As a result, we must determine whether the evidence presented "a prima facie case [of second-degree murder and use of a firearm in the commission of a felony] for consideration by the" jury. *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)).

"Whether the evidence adduced is sufficient to prove each of th[e] elements [of an offense] is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Linnon*, 287 Va. at 98 (quoting *Lawlor*, 285 Va. at 223-24). "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Id.* (quoting *Lawlor*, 285 Va. at 224). "After so viewing the evidence, the question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Lawlor*, 285 Va. at 224).

Quinones Berrios contends that the Commonwealth failed to prove his identity as the perpetrator of each offense beyond a reasonable doubt. He asserts that he had no motive to kill

Rivera and that it was a mere coincidence that he and the shooter both wore a black shirt with white lettering that evening. He also contends that no eyewitnesses identified him as the shooter and that Valle could not recognize the shooter's voice as his. To explain the presence of his DNA on the gun, he asserts that Rivera gave him the firearm earlier that evening. Further, the Commonwealth's own evidence established that primer residue could be transferred from merely touching a recently fired firearm. Finally, Quinones Berrios argues that the evidence failed to disprove his reasonable hypothesis of innocence—that someone else killed Rivera.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). But "[o]ur inquiry does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Hudson*, 265 Va. at 513). "[T]he combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005) (citing *Hudson*, 265 Va. at 514). Where the Commonwealth relied on "circumstantial evidence to carry its burden of proof beyond a reasonable doubt, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence.'" *Moseley*, 293 Va. at 463 (quoting *Commonwealth v. Smith*, 259 Va. 780, 783 (2000)).

While the Commonwealth bears a weighty burden of proof, the fact finder has "[t]he sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only

when we find that the witness'[s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)). And "[m]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). We leave to the fact finder to determine how to weigh the evidence. *Id.*

Here, the evidence at trial was sufficient for a rational fact finder to convict Quinones Berrios of second-degree murder beyond a reasonable doubt. Both Valle and Vasquez admitted that they, along with Rivera, Quinones Berrios, and Luis, were at Walmart in the early morning hours on June 11, 2021. The Commonwealth presented surveillance footage from Walmart that showed Quinones Berrios, Rivera, Luis, Valle, and Vasquez. Both Valle and Vasquez identified themselves in the surveillance footage and identified Quinones Berrios as the tall man wearing a black baseball hat, a black long-sleeved shirt with white lettering down the left sleeve, and black pants. The surveillance footage was admitted as an exhibit and was available to the jury to permit the jurors to draw their own conclusions regarding the identity of those depicted in it.

Valle testified that when she and Rivera arrived home, a man approached their vehicle from behind. The man stated, "Because you f***ed with us" in a Puerto Rican dialect of Spanish and simultaneously shot Rivera. Valle turned and saw that the assailant wore a black shirt. Upon realizing what was happening, Valle fled. However, she looked back at the shooter and observed that he wore a predominantly black neck gaiter with some color, and a black hat.

- 18 -

Three eyewitnesses who observed the shooting testified at trial. Each witness testified that they heard a noise that attracted their attention. Millirons and Hamze both testified to seeing a man wearing a black shirt with white on the left sleeve, and dark or black pants. He was described as "tall" or between 5'8" and 5'10". Hamze noted a black hat. Millirons and Hamze saw the man approach Rivera with a pistol as Rivera backpedaled with his hands up. Millirons, Hamze, and Chick each saw Rivera stumble and fall between two trucks, and the armed man shoot Rivera from mere feet away. As each of the eyewitnesses called 911, they described the assailant and told dispatch that he fled toward Old Virginia Beach Road. Chick testified to following the shooter and seeing him flee from Old Virginia Beach Road to North Birdneck Road. When the shooter arrived at the intersection of Waterfront Drive and Marabou Lane, Chick saw police vehicles surround the shooter.

As officers responded to the scene, they observed a man matching the suspect's description on North Birdneck Road. Officers chased the suspect along North Birdneck Road and then Marabou Lane until they lost sight of him. Minutes later, officers observed a man wearing all black on Nighthawk Place but the suspect again evaded capture. The police established a perimeter around the residential area and eventually they arrested Quinones Berrios; officers confirmed that he was the man who had fled from them earlier. When Quinones Berrios was arrested, he was wearing a black hat, black shirt with white lettering down the left sleeve, and black pants. He also had a predominantly black gaiter on his person. The jury was shown body camera footage, interview footage, and photographs of the clothing Quinones Berrios wore that evening.

On the morning after the shooting, a fanny pack containing Rivera's identification and thousands of dollars in U.S. currency, as well as a bookbag containing a tan .45-caliber firearm, were recovered along the route that Quinones Berrios followed as he fled from the police. The

- 19 -

gun was the same firearm that Rivera gave to Quinones Berrios earlier in the Walmart parking lot. The recovered firearm was determined to have fired the two cartridge casings found at the scene. Further, Quinones Berrios could not be eliminated as a contributor to the DNA mixture found on the firearm's trigger and grip. Officers found a particle consistent with firing a firearm greater than a .22 caliber on Quinones Berrios's left hand. And during a recorded phone conversation played for the jury, Quinones Berrios admitted that he and Rivera were arguing on June 11, 2021, and that he was high on drugs. Considering the totality of the evidence, a reasonable fact finder could conclude beyond a reasonable doubt that Quinones Berrios was the man who shot Rivera and find him guilty of second-degree murder.

Having concluded that the evidence supports Quinones Berrios's conviction for second-degree murder, we also conclude that a reasonable fact finder could have convicted him of use of a firearm in the commission of a felony. To sustain Quinones Berrios's firearm conviction, the Commonwealth was required to prove that he "use[ed] or attempt[ed] to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit . . . murder." Code § 18.2-53.1. Quinones Berrios challenges his conviction only on the basis that the Commonwealth failed to prove that he had committed murder. Accordingly, finding the evidence sufficient for the murder charge, we also affirm his conviction on the firearm charge.

CONCLUSION

Because the circuit court's exclusion of McMahon's body-worn-camera footage under the hearsay rule did not violate Quinones Berrios's due process rights, and the circuit court did not err in denying Quinones Berrios's motions to strike, we affirm the circuit court's judgment.

*Affirmed.*